RETAIL CLERKS INTERNATIONAL ASSOCIA-
TION, LOCAL 1625, AFL-CIO, ET AL. *v.*
SCHERMERHORN ET AL.

No. 368.   Argued April 18, 1963.—Decided June 3, 1963.

. *S. G. Lippman* argued the cause for petitioners.   With
him on the briefs were *Tim L. Bornstein, Russell Specter*
and *Claude Pepper.*

*Bernard B. Weksler* argued the cause for respondents.
With him on the brief was *John L. Kilcullen.*

*J. Albert Woll, Robert C. Mayer, Theodore J. St. Antoine, Thomas E. Harris, Joseph L. Rauh, Jr., John Silard* and *Harold A. Cranefield* filed a brief for the American Federation of Labor and Congress of Industrial Organizations et al., as *amici curiae,* urging reversal.

Briefs of *amici curiae,* urging affirmance, were filed by *Richard W. Ervin,* Attorney General of Florida, *Richmond M. Flowers,* Attorney General of Alabama, *Robert Pickrell,* Attorney General of Arizona, *Evan L. Hultman,* Attorney General of Iowa, *William M. Ferguson,* Attorney General of Kansas, *Joe T. Patterson,* Attorney General of Mississippi, *Clarence A. H. Meyer,* Attorney General of Nebraska, *T. Wade Bruton,* Attorney General of North Carolina, *Daniel R. McLeod,* Attorney General of South Carolina, *Frank Farrar,* Attorney General of South Dakota, *George F. McCanless,* Attorney General of Tennessee, *Waggoner Carr,* Attorney General of Texas, and *A. Pratt Kesler,* Attorney General of Utah, for their respective States; by *Robert Y. Button,* Attorney General of Virginia, *D. Gardiner Tyler,* Assistant Attorney General, and *Frederick T. Gray,* Special Assistant Attorney General, for the Commonwealth of Virginia; and by *William B. Barton* and *Harry J. Lambeth* for the Chamber of Commerce of the United States.

MR. JUSTICE WHITE delivered the opinion of the Court.

Like *Labor Board* v. *General Motors Corp., ante,* p. 734, decided today, this case involves the status of an "agency shop" arrangement. We have concluded that the contract involved here is within the scope of § 14 (b) of the National Labor Relations Act and therefore is congressionally made subject to prohibition by Florida law. We have not determined, however, whether the Florida courts, rather than solely the National Labor Relations Board, are tribunals with jurisdiction to enforce

748

the State's prohibition against such arrangements. Accordingly, the case is retained on the calendar for reargument on the undecided issue.

Retail Clerks Local 1625 is the certified bargaining agent for the Food Fair Stores supermarket chain in five South Florida counties. In October 1960 the union and the employer negotiated a collective bargaining agreement effective until April 1963.[1] The contract provided for various terms and conditions of employment, such as protection against discharge except for just cause, paid vacations and holidays, pregnancy leaves of absence, life and hospitalization insurance, paid time off to vote, to serve on juries, and to attend funerals, as well as for wage-and-hour terms; a grievance and arbitration clause was inserted for enforcement of these terms, under which the union and employer agree to divide between them the cost of the grievance-arbitration machinery. The contract also contained Article 19, which is the subject of the present lawsuit:

> "Employees shall have the right to voluntarily join or refrain from joining the Union. Employees who choose not to join the Union, however, and who are covered by the terms of this contract, shall be required to pay as a condition of employment, an initial service fee and monthly service fees to the Union for the purpose of aiding the Union in defraying costs in connection with its legal obligations and responsibilities as the exclusive bargaining agent of the employees in the appropriate bargaining unit.

---

[1] Article 45 provides:

"This Agreement shall continue in effect from April 18, 1960 to April 15, 1963, and continue in effect from year to year thereafter unless either party notifies the other party sixty (60) days prior to expiration date, or any anniversary date thereafter, of their desire to terminate or open the agreement for the purpose of amendments and/or changes."

The aforesaid fees shall be payable on or before the first day of each month, and such sums shall in no case exceed the initiation fees and the membership dues paid by those who voluntarily choose to join the Union. Other than the payment of these service fees, those employees who do not choose to join the Union shall be under no further financial obligations or requirements of any kind to the Union. It shall also be a condition of employment that all employees covered by this Agreement shall on the 30th day following the beginning of such employment or the effective date of this agreement, whichever is later, pay established initial and monthly service fees as shown above."

The union and the employer jointly posted a notice to employees, immediately after execution of the collective agreement, explaining the new contract with particular reference to the agency shop clause:

"The Agency Shop recognizes that union membership in the State of Florida is a voluntary act of the employee. On the other hand, under an Agency Shop Agreement, those Employees who do not become members of the Union nevertheless are required to pay the necessary service fees to the Local Union in order to aid the Union in meeting its authorized expenses as the exclusive bargaining agent.

"Therefore, the Company and the Union have agreed that even though you may not have joined the Union, you are obligated, under the provisions of the Agency Shop, to pay an initial service fee which is the equal of the initiation fee for Union members and a monthly service fee which is the equal of the monthly dues for those who voluntarily become Union members. Note: An Employee who pays the

regular initial fee and regular monthly service fee but does not voluntarily join the Union, does not participate in the internal union affairs even though said Employee receives equal treatment under the contract."

The present class action was then instituted by respondents, four nonunion employees of Food Fair, who sought a declaration that Article 19 was "null and void and unenforceable," a temporary and permanent injunction against petitioner and Food Fair to prevent them from requiring respondents or members of the class on behalf of which they sued (all Food Fair employees covered by the collective agreement) to contribute money to the union under Article 19, and an accounting. The trial court granted a motion to dismiss on the ground that Article 19 did not violate the Florida right-to-work law, Fla. Const. § 12.[2] 47 L. R. R. M. 2300. The Florida Supreme Court reversed, holding that state law forbade and that its courts could deal with the agency shop clause involved here, and remanded the case for further proceedings in the trial court. 141 So. 2d 269, cert. granted, 371 U. S. 909.

## I.

The case to a great extent turns upon the scope and effect of § 14 (b) of the National Labor Relations Act, added to the Act in 1947, 29 U. S. C. § 164 (b):

"Nothing in this Act shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a

---

[2] "The right of persons to work shall not be denied or abridged on account of membership or non-membership in any labor union, or labor organization; provided, that this clause shall not be construed to deny or abridge the right of employees by and through a labor organization or labor union to bargain collectively with their employer."

condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law."

As is immediately apparent from its language, § 14 (b) was designed to prevent other sections of the Act from completely extinguishing state power over certain union-security arrangements. And it was the proviso to § 8 (a)(3),[3] expressly permitting agreements conditioning employment upon membership in a labor union, which Congress feared might have this result. It was desired to "make certain" that § 8 (a)(3) could not "be said to authorize arrangements of this sort in States where such arrangements were contrary to the State policy." H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess. 60, 1 Leg. Hist. L. M. R. A. 564.

The connection between the § 8 (a)(3) proviso and § 14 (b) is clear. Whether they are perfectly coincident, we need not now decide, but unquestionably they overlap to some extent. At the very least, the agreements requiring "membership" in a labor union which are expressly permitted by the proviso are the same "membership" agreements expressly placed within the reach of state law by § 14 (b). It follows that the *General Motors* case rules this one, for we there held that the "agency shop" arrangement involved here—which imposes on employees the only membership obligation enforceable under § 8 (a)(3) by discharge, namely, the obligation to pay initiation fees and regular dues—is the "practical equivalent" of an "agreement requiring membership in a labor organization as a condition of employment." Whatever

---

[3] *"Provided,* That nothing in this Act, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization . . . to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later . . . ."

may be the status of less stringent union-security arrangements, the agency shop is within § 14 (b). At least to that extent did Congress intend § 8(a)(3) and § 14 (b) to coincide.

Petitioners, belatedly,[4] would now distinguish the contract involved here from the agency shop contract dealt with in the *General Motors* case on the basis of allegedly distinctive features which are said to require a different result. Article 19 provides for nonmember payments to the union "for the purpose of aiding the Union in defraying costs in connection with its legal obligations and responsibilities as the exclusive bargaining agent of the employees in the appropriate bargaining unit," a provision which petitioners say confines the use of nonmember payments to collective bargaining purposes alone and forbids their use by the union for institutional purposes unrelated to its exclusive agency functions, all in sharp contrast, it is argued, to the *General Motors* situation where the nonmember contributions are available to the union without restriction.

We are wholly unpersuaded. There is before us little more than a complaint with its exhibits. The agency shop clause of the contract is, at best, ambiguous on its face and it should not, in the present posture of the case, be construed against respondent to raise a substantial difference between this and the *General Motors* case. There is no ironclad restriction imposed upon the use of nonmember fees, for the clause merely describes the pay-

---

[4] The petition for certiorari posed the question for review as whether § 14 (b) "authorizes the states both to prohibit and to regulate an 'agency shop' clause." The present clause was likened to, rather than distinguished from, the *General Motors* arrangement. It was only upon briefing and argument that petitioners sought to place this alleged "service fee" contract in a different category from the agency shop. Cf. *National Licorice Co.* v. *Labor Board,* 309 U. S. 350, 357, n. 2.

ments as being for "the purpose of aiding the Union" in meeting collective bargaining expenses. The alleged restriction would not be breached if the service fee was used for both collective bargaining and other expenses, for the union would be "aided" in meeting its agency obligations, not only by the part spent for bargaining purposes but also by the part spent for institutional items, since an equivalent amount of other union income would thereby be freed to pay the costs of bargaining agency functions.

But even if all collections from nonmembers must be directly committed to paying bargaining costs, this fact is of bookkeeping significance only rather than a matter of real substance. It must be remembered that the service fee is admittedly the exact equal of membership initiation fees and monthly dues, see p. 749, *supra*,[5] and that, as the union says in its brief,[6] dues collected from members

---

[5] This is the factual posture in which the case comes to us, on motion to dismiss. The evidence on this point, if any favorable to petitioners was adduced at the hearing for preliminary injunction, was not made part of the record.

[6] "Rather typically, unions use their members' dues to promote legislation which they regard as desirable and to defeat legislation which they regard as undesirable, to publish newspapers and magazines, to promote free labor institutions in other nations, to finance low cost housing, to aid victims of natural disaster, to support charities, to finance litigation, to provide scholarships, and to do those things which the members authorize the union to do in their interest and on their behalf."

We cannot take seriously petitioners' unsupported suggestion at the oral argument that we must assume that the union spends all of its income on collective bargaining expenses. The record is entirely silent on this matter one way or the other and it would be unique indeed if the union expended no funds for noncollective bargaining purposes. See Brief for N. L. R. B., *Labor Board* v. *General Motors Corp.*, No. 404, p. 38. As indicated in the text, petitioners' brief seems to concede as much and petitioners later appeared to modify or withdraw the suggestion at the oral argument. In any event, we have only the pleadings and we are bound to give the

may be used for a "variety of purposes, in addition to meeting the union's costs of collective bargaining." Unions "rather typically" use their membership dues "to do those things which the members authorize the union to do in their interest and on their behalf." If the union's total budget is divided between collective bargaining and institutional expenses and if nonmember payments, equal to those of a member, go entirely for collective bargaining costs, the nonmember will pay more of these expenses than his pro rata share. The member will pay less and to that extent a portion of his fees and dues is available to pay institutional expenses. The union's budget is balanced. By paying a larger share of collective bargaining costs the nonmember subsidizes the union's institutional activities. In over-all effect, economically, and we think for the purposes of § 14 (b), the contract here is the same as the *General Motors* agency shop arrangement. Petitioners' argument, if accepted, would lead to the anomalous result of permitting Florida to invalidate the agency shop but forbidding it to ban the present service fee arrangement under which collective bargaining services cost the nonmember more than the member.

## II.

The more difficult phases of this case remain. In petitioners' motion to dismiss filed in the trial court the contract at issue was said to be an arguable unfair labor practice and the subject matter of the action therefore within the exclusive jurisdiction of the National Labor Relations Board and beyond the power of the state courts to prohibit. The motion was granted, but on another ground, and the preemption argument was renewed but

respondents the benefit of every reasonable inference from well-pleaded facts. *Wheeldin* v. *Wheeler*, 373 U. S. 647, 648; *Kendall* v. *United States*, 7 Wall. 113, 116; *Rhode Island* v. *Massachusetts*, 15 Pet. 233, 272.

rejected in the Florida Supreme Court. It is now pressed here and has at least two related but distinctive aspects.

It is first urged that whether or not a particular union-security contract is within the category subjected to state law by § 14 (b) is a matter for the Board and no business of the state courts, at least in the doubtful cases where the coverage of § 14 (b) is not a clearly settled matter. If a contract is not within § 14 (b), the argument goes, it is protected by federal law. If within § 14 (b), the arrangement is an unfair practice, at least arguably so. Therefore, where the status of a contract for the purposes of § 14 (b) is at all doubtful, the Board is assertedly the tribunal to deal with the question. Although we were asked in the petition for certiorari, and again in petitioners' brief for oral argument, to resolve the § 14 (b) issue in this agency shop case, the clear thrust of this phase of petitioners' preemption argument is that neither the Florida courts nor this Court should purport in the first instance to determine the status of an agency shop contract under § 14 (b).

There is much force in the argument that the assessment of any union-security arrangement for the purposes of §§ 7, 8 and 14 (b), when there is significant doubt about the matter, is initially a task for the Board, so that it may finally come to this Court with the benefit of the affected agency's views, and in all probability the preemption issue was entitled to different treatment than it received in the Florida courts at the time this case was decided. But what was then an arguable matter under § 14 (b) is not necessarily arguable now. In the first place, as we have held in the *General Motors* case, an agency shop arrangement is the equivalent of a permitted § 8 (a)(3) membership agreement, a result which rules this case since, as we have indicated, § 14 (b) subjects to state law the membership agreements, or their equivalent, which are permitted by § 8 (a)(3). Secondly, the Board's

brief in the *General Motors* case contained the Board's own view of the status of the agency shop agreement under § 14 (b): the provision conditioning employment upon the payment of sums equal to initiation fees and monthly dues is within the § 8 (a)(3) proviso, within the scope of § 14 (b), and hence subject to invalidation by state law. What was an arguable question of § 8 (a)(3) and § 14 (b) coverage has been settled, not only in the light of, but consistently with, the views of the Board. We see no reason to hold our hand at this juncture in order that the Board may arrive again at what is now a foregone conclusion. Cf. *Maritime Board* v. *Isbrandtsen Co.*, 356 U. S. 481.

The second question implicit in petitioners' preemption argument is whether a state court may enjoin the operation of an agency shop arrangement which the State has declared to be unlawful as it may do under § 14 (b). Without the proviso to § 8 (a)(3) and a similar saving clause in § 7, conditioning employment upon union membership would be an obvious unfair labor practice, under §§ 8 (a)(1), 8 (a)(3), and 8 (b)(2), as Congress recognized in adding the proviso to original § 8 (3). With the proviso, however, such arrangements, if they comply with the terms of the proviso, are not unfair practices. Section 14 (b), with obvious reference to § 8 (a) (3), declares that "nothing in this Act" is to authorize "the execution or application" of membership agreements in States in which such execution or operation is prohibited by state law. It is one thing if § 14 (b) and a state law prohibiting the union or the agency shop have no impact on §§ 7 and 8 at all, and the union and agency shops are therefore not unfair practices under federal law even in those States which prohibit them. It is quite another matter, however, if § 14 (b) removes the protection of the § 8 (a)(3) proviso and the union and agency shops become unfair labor practices in States where state law

forbids them, for then the obvious question is precipitated as to whether a State as well as the Board may enjoin such union-security arrangements. The scope and vitality of the Court's decision in *Algoma Plywood Co.* v. *Wisconsin Board,* 336 U. S. 301, are involved, as is the applicability of the preemption doctrine, subsequently developed in many cases in this Court, such as *Garner* v. *Teamsters Union,* 346 U. S. 485; *San Diego Council* v. *Garmon,* 359 U. S. 236, to situations where state law invalidates union-security contracts placed within their reach by § 14 (b).

We hold that § 14 (b) of the Act subjects this arrangement to state substantive law, and that the legality of Article 19 is governed by the decision of the Florida Supreme Court under review here. As to the unresolved issue of whether the Florida courts have jurisdiction to afford a remedy for violation of the state law, we prefer not to dispose of the matter without full argument next Term. Moreover, since we have not had the benefit of the views of the National Labor Relations Board, the Solicitor General is invited to file a brief expressing the views of the Government. The case is retained on the calendar and set for reargument during the forthcoming Term on the remaining issue.

*It is so ordered.*

MR. JUSTICE GOLDBERG took no part in the consideration or decision of this case.