## No. 26651
## No. 26797

**Communications Workers of America, an unincorporated labor association v. Western Electric Company, Incorporated, a New York corporation, State of Colorado, Department of Labor and Employment, Division of Labor, James M. Shaffer, Executive Director, State of Colorado, Department of Labor and Employment, Division of Labor, Industrial Commission of the State of Colorado, Henry C. Kimbrough, in his capacity as a member of the Industrial Commission of the State of Colorado, Albert F. Mangan, in his capacity as a member of the Industrial Commission of the State of Colorado, and Kenneth C. Russell, in his capacity as a member of the Industrial Commission of Colorado, and The Mountain States Telephone & Telegraph Company, a Colorado corporation**

(551 P.2d 1065)

Decided June 7, 1976. Opinion modified and as modified rehearing denied and supplemental petition for rehearing denied July 6, 1976.

130

John W. McKendree, Clay Smith, Charles V. Koons, of counsel, for plaintiff-appellant.

Rovita, DeMuth & Eiberger, Carl F. Eiberger, Russell P. Rowe, Jeffrey G. Pearson, for defendant-appellee Western Electric Company, Incorporated.

David R. Hansen, Lawrence M. Joseph, Robert Levitt, for defendant-appellee The Mountain States Telephone and Telegraph Company.

J. D. MacFarlane, Attorney General, Jean E. Dubofsky, Deputy, Edward G. Donovan, Solicitor General, Peter L. Dye, Assistant, for defendants-appellees State Agencies and Officials.

Gorsuch, Kirgis, Campbell, Walker and Grover, David R. Gorsuch, Rex H. Reed, for amicus curiae, National Right to Work Legal Defense Foundation, Inc.

Criswell & Patterson, John A. Criswell, for amicus curiae, Colorado-Wyoming Joint Council of Teamsters No. 54.

Walter C. Brauer, III, Mark N. Simons, for amicus curiae, Colorado Labor Council.

*En Banc.*

MR. JUSTICE ERICKSON delivered the opinion of the Court.

This is an appeal by the plaintiff, Communications Workers of America (an unincorporated labor association, hereinafter referred to as C.W.A.) from an adverse decision of the District Court for the City and County of Denver. The defendants are the Western Electric Company, Inc., a New York corporation; the State of Colorado, Department of Labor and Employment, Division of Labor; James M. Shaffer, Executive Director of the Division of Labor; the Industrial Commission of the State of Colorado; Henry C. Kimbrough, Albert F. Mangan, and Kenneth C. Russell, members of the Industrial Commission; and the Mountain States Telephone & Telegraph Co., a Colorado corporation.

This appeal followed a determination by the district court of a consolidated action which was submitted as an agreed case and on stipulated records and evidence pursuant to C.R.C.P. 7(d). No significant issues of fact are in controversy. The relief prayed for was a declaration of the rights, status, and legal relations of the Communications Workers of America under certain union security provisions contained in collective bargaining agreements with the defendants Mountain States Telephone & Telegraph Co., and the Western Electric Co., Incorporated. The petitioner sought a declaration that the union security provisions were valid and enforceable in the absence of an "all-union" referendum conducted by the director of the Division of Labor.

The district court determined that declaratory relief, pursuant to C.R.S. 1963, 77-11-1,[1] *et seq.*, was appropriate and concluded that the contested provisions of the various collective bargaining agreements were illegal, invalid, and unenforceable. *See also* C.R.C.P. 57. We affirm.

The international headquarters of the plaintiff, C.W.A., is located in Washington, D.C., and its principal place of business in Colorado is in Denver. Under certain collective bargaining agreements entered into in 1968 and 1971, C.W.A. became lawfully entitled to represent, as the exclusive bargaining agent, certain employees in the industrial field forces of the Service Division of Western Electric Company, Incorporated, in several states of the United States, including Colorado. C.W.A. is also,

---

[1] Now section 13-51-105, C.R.S. 1973.

pursuant to other collective bargaining agreements, lawfully entitled to represent, as the exclusive bargaining agent, certain employees in the Plant and Traffic Departments of The Mountain States Telephone and Telegraph Company (hereinafter Mountain States).

In this appeal, seven collective bargaining agreements, with attendant union security clauses, are at issue. Three of these were entered into between C.W.A. and Mountain States and four were entered into between C.W.A. and Western Electric. The details of the contested union security clauses of the several collective bargaining agreements will be set forth in the text of this opinion.

On May 9, 1968, a collective bargaining agreement was entered into between C.W.A. and defendants, Mountain States and the Division of Labor, covering certain employees in the Plant Department of Mountain States. This agreement reads, in pertinent part:

"2.1 The Company and the Union agree that they will not interfere with the rights of employees to join or refrain from joining the Union and agree that they will not in any manner, because of an employee's membership or nonmembership therein directly or indirectly discriminate against, interfere with, coerce, restrain, discharge, demote, transfer, or discipline any employee.

. . . .

"14.1 Each employee who is a member of the Union on or after the 30th calendar day following the beginning of his employment, or on or after the effective date of this Agreement, whichever is the later, shall as a condition of employment pay or tender to the Union an amount equal to the periodic Union dues until the termination of this Agreement, except that each such employee may, within the 10-day period immediately preceding May 9, 1971, upon which date the Agreement terminates, terminate his obligation to tender periodic Union dues to the Union as a condition of employment by notifying both the Union and the Company in writing of his withdrawal from membership in the Union.

"14.2 Said condition of employment shall reapply to any such employee after his return to the bargaining unit following any transfer out of the bargaining unit, any removal from the payroll of the Company, or any leave of absence of more than one month's duration, provided such employee is a member of the Union on or after the 30th day following his return to the bargaining unit.

"14.3 The provisions of this Article shall not apply to any employee in any state in which the application of such provision would be inconsistent with the law of such State.

"14.4 The Company may inform employees and applicants for employment of their rights and obligations under the provisions of this Article."

On the same date, another collective bargaining agreement was entered into between C.W.A. and Mountain States and the Division of

Labor covering certain employees in the Traffic Department of Mountain States, which provides:

"1.1 The Company, its officers and supervisors, shall not interfere with the rights of employees to become and remain members of the Union and shall not in any manner, directly or indirectly, discriminate against, interfere with, coerce, restrain, discharge, demote, transfer or discipline any employee by reason of his or her membership or nonmembership in the Union.

. . . .

"Article 15
"Section 1: Maintenance of Dues

"1.1 Each employee who is a member of the Union on or after the 30th calendar day following the beginning of her employment, or on or after the effective date of this Agreement, whichever is the later, shall as a condition of employment pay or tender to the Union an amount equal to the periodic Union dues until the termination of this Agreement, except that each such employee may, within the 10 day period, immediately preceding May 9, 1971, upon which date the Agreement terminates, terminate his obligation to tender periodic Union dues to the Union as a condition of employment by notifying both the Union and the Company in writing of her withdrawal from membership in the Union.

"1.2 Said condition of employment shall reapply to any such employee after her return to the bargaining unit following transfer out of the bargaining unit, any removal from the payroll of the Company, or any Leave of Absence of more than one month's duration, provided such employee is a member of the Union on or after the 30th day following her return to the bargaining unit.

"1.3 The provisions of this Article shall not apply to any employee in any State in which the application of such provision would be inconsistent with the law of such State.

"1.4 The Company may inform employees and applicants for employment of their rights and obligations under the provisions of this Article."

During the term of the first two Mountain States collective bargaining agreements, numerous Colorado employees of Mountain States within the bargaining units covered by the foregoing agreements were members of C.W.A. Their membership was in effect on or after the thirtieth calendar day following the beginning of their employment or on or after the effective date of the agreement. Thereafter, several employees ceased paying or tendering to C.W.A. an amount equal to their periodic union dues. The payments were not ceased within the ten-day period immediately preceding the termination date of the applicable collective bargaining agreement, the "escape" period under the contracts.

On or about June 3, 1970, and again on or about September 3, 1970, C.W.A. demanded that Mountain States dismiss the employees who had

ceased paying or tendering to the union an amount equal to their periodic union dues. C.W.A. alleged that the employees were in violation of the contract provisions set out above. Mountain States refused to dismiss the employees contending that the above-cited provisions were not binding because of the provisions of the Colorado Labor Peace Act, C.R.S. 1963, 80-4-1,[2] *et seq.* (as amended).

Another collective bargaining agreement was entered into between C.W.A. and Mountain States and the Division of Labor on or about the 18th of July, 1971. This agreement covered certain employees of the Plant and Traffic Department of Mountain States, and set forth:

"2.1 The Company and the Union agree that they will not interfere with the rights of employees to join or refrain from joining the Union and agree that they will not in any manner, because of an employee's membership or nonmembership therein directly or indirectly discriminate against, interfere with, coerce, restrain, discharge, demote, transfer, or discipline any employee.

. . . .

"Article 21
"Modified Agency Shop

"21.1 Each regular employee who is a member of the Union on the date of ratification or approval of this agreement by the President of the Union, whichever is later, or who later becomes a member of the Union and all regular employees hired on or after that date shall as a condition of employment pay or tender to the Union amounts equal to the periodic dues applicable to members for the period from such date of ratification or approval or the date of later becoming a member or, in the case of regular employees hired on or after such date of ratification or approval, 30 days after hire, whichever of these dates is later until the termination of this contract, except that an employee may terminate this condition of employment by giving written notice to the Company and the Union of such termination, and, if applicable, his withdrawal from membership in the Union by registered mail, return receipt requested, and postmarked within the ten-day calendar period immediately preceding 11:59 P.M., July 28, 1971.

"21.2 Said condition of employment shall reapply to any such employee after returning to the bargaining unit following any transfer out of the bargaining unit, any removal from the payroll of the Company, or any leave of absence of more than one month's duration, provided such employee is a member of the Union on or after the 30th day following return to the bargaining unit.

---

[2]Now section 8-3-101, C.R.S. 1973.

"21.3 The provisions of this Article shall not apply to any employee in any state in which the application of such provision would be inconsistent with the law of such State.

"21.4 The Company may inform employees and applicants for employment of their rights and obligations under the provisions of this Article."

Defendant Western Electric Company Incorporated entered into a collective bargaining agreement with C.W.A. on May 1, 1968, covering certain communications equipment workers in the installation field forces of the Service Division of Western Electric. This contract was denominated as Contract C.W.A.-12 and provides:

"Article 24
"Maintenance of Union Dues

"1. Each Employee who is a member of the Union:

"(a) on or after the 30th calendar day following the beginning of his employment, or

"(b) on or after the effective date of this contract,

whichever is the latest, shall, as a condition of employment pay or tender to the Union an amount equal to the periodic Union dues until the final termination of this contract, except that each such Employee may, within the ten (10) day period immediately preceding the termination date of this contract, terminate his obligations to tender periodic Union dues to the Union as a condition of employment by notifying both the Union and the Company of his withdrawal from membership in the Union.

"1.1 Said condition of employment shall reapply to any such Employee after his return to the bargaining unit following any period of formal separation* therefrom, provided such Employee is a member of the Union on or after the 30th day following his return to the bargaining unit.

*Includes:

Transfers out of the bargaining unit. Removal from the payroll of the Company. Leaves of Absence of more than one (1) month duration.

"2. The provision of this Article 24 shall not be effective if inconsistent with the law of the applicable State.

"3. The Company may inform Employees and applicants for employment of their rights and obligations under the provisions of this Article 24."

Because job clerks are also employed in the installation field forces of the Service Division of Western Electric, a separate collective bargaining agreement was entered into with C.W.A. on May 1, 1968, covering these employees, and denominated as Contract C.W.A.-JC-12, Article 23 of Contract C.W.A.-JC-12 states:

"Article 23
"Maintenance of Union Dues

"1. Each Employee who is a member of the Union:

"(a) on or after the 30th calendar day following the beginning of his employment, or

"(b) on or after the effective date of this contract.
whichever is the latest, shall, as a condition of employment pay or tender to the Union an amount equal to the periodic Union dues until the final termination of this contract, except that each such Employee may, within the 10 day period immediately preceding the termination date of this contract terminate his obligation to tender periodic Union dues to the Union as a condition of employment by notifying both the Union and the Company of his withdrawal from membership in the Union.

"1.1 Said condition of employment shall reapply to any such Employee after his return to the bargaining unit following any period of formal separation* therefrom, provided such Employee is a member of the Union on or after the 30th day following his return to the bargaining unit.

*Includes:
Transfers out of the bargaining unit. Removal from the payroll of the Company. Leaves of Absence of more than one (1) month duration.

"2. The provisions of this Article 23 shall not be effective if inconsistent with the laws of the applicable State.

"3. The Company may inform Employees and applicants for employment of their rights and obligations under the provisions of this Article 23."

During the term of these two collective bargaining agreements with C.W.A. numerous Colorado employees of Western Electric in the appropriate bargaining unit covered by the agreements were members of C.W.A. either on or after the thirtieth calendar day following the beginning of their employment or on or after the effective date of the applicable agreement. These employees ceased paying or tendering to the union an amount equal to their periodic union dues, and in each case, cessation did not occur within the "escape" period under the agreements.

On June 5, 1970, C.W.A. demanded of Western Electric that it take action under the two 1968 collective bargaining agreements and terminate Western Electric's employees. Western Electric replied that before an employer may enter into an agreement providing for union security in Colorado, the Industrial Commission of Colorado must certify that three-quarters or more of the bargaining unit employees shall have voted affirmatively in a referendum in favor of such an agreement. A letter went on to describe Western Electric's position:

". . . since no such referendum has been conducted among the bargaining unit employees based in Colorado, it would violate Colorado law to condition the employment of these employees upon the payment of union dues. Accordingly, we must deny your request that the Company terminate the above-named employees because of their alleged failure to pay dues to the Union because the contract articles have no effect in light of the provisions of the Colorado Labor Peace Act, C.R.S. 80-4-1 (1963), et seq., as amended."

Contract C.W.A.-13 was entered into between Western Electric and C.W.A. in July, 1971, covering certain communication equipment workers of the installation field forces of the Service Division of the company. Article 24 of C.W.A.-13 provides, in pertinent part:

"Article 24
"Union Security

"1. Each Employee who is a member of the Union on the date of ratification or approval of this Contract by the President of the Communications Workers of America, whichever is later, or who later becomes a member of the Union and all Employees hired on or after such date shall as a condition of employment pay or tender to the Union amounts equal to the periodic dues applicable to members for the period from such date of ratification or approval or the date of later becoming a member or, in the case of Employees hired on or after such date of ratification or approval, thirty (30) days after hire, whichever of these dates is later until the termination of this Contract, except that an Employee may terminate this condition of employment by giving written notice to the Company and the Union of such termination, and, if applicable, his or her withdrawal from membership in the Union, by registered mail, return receipt requested, and postmarked with the ten (10) day calendar period immediately preceding ll:59 P.M., July 27, 1971.

"2. The condition of employment specified in Paragraph 1 shall not apply during the periods of formal separation* from the bargaining unit by any such Employee but shall reapply to such Employee on the thirtieth (30th) day following his or her return to the bargaining unit.

*The term 'formal separation' includes transfers out of the bargaining unit, removal from the payroll of the Company, and Leaves of Absence of more than one (1) month duration.

"3. The Company may inform Employees and applicants for employment of their rights and obligations under the provisions of this article.

"4. This article shall apply only in those States and the District of Columbia where the law permits the Union to enter into this type of union security agreement. If during the term of this Contract the Union shall become duly authorized under the laws of any other State to enter into this type of union security agreement, the effective date of this article as to Employees in such State shall be the date upon which the Company receives proper written evidence from the Union that it is fully qualified to enter into such an agreement in such State."

Another collective bargaining agreement was entered at the same time as C.W.A.-13, covering job clerks employed in the installation field forces of the Service Division of Western Electric. This agreement was denominated as C.W.A.-JC-13. Article 23 of that agreement is relevant and provides:

"Article 23
"Union Security

"1. Each Employee who is a member of the Union on the date of ratifica-

tion or approval of this Contract by the President of the Communications Workers of America, whichever is later, or who later becomes a member of the Union and all Employees hired on or after such date shall as a condition of employment pay or tender to the Union amounts equal to the periodic dues applicable to members for the period from such date of ratification or approval or the date of later becoming a member or, in the case of Employees hired on or after such date of ratification or approval, thirty (30) days after hire, whichever of these dates is later until the termination of this Contract, except that an Employee may terminate this condition of employment by giving written notice to the Company and the Union of such termination, and, if applicable, his or her withdrawal from membership in the Union, by registered mail, return receipt requested, and postmarked within the ten (10) day calendar period immediately preceding 11:59 P.M., July 27, 1971.

"2. The condition of employment specified in Paragraph 1 shall not apply during periods of formal separation* from the bargaining unit by any such Employee but shall reapply to such Employee on the thirtieth (30th) day following his or her return to the bargaining unit.

*The term 'formal separation' includes transfers out of the bargaining unit, removal from the payroll of the Company, and Leaves of Absence of more than one (1) month duration.

"3. The company may inform Employees and applicants for employment of their rights and obligations under the provisions of this article.

"4. This article shall apply only in those States and the District of Columbia where the law permits the Union to enter into this type of union security agreement. If during the term of this Contract the Union shall become duly authorized under the laws of any other State to enter into this type of union security agreement, the effective date of this article as to Employees in such State shall be the date upon which the Company receives proper written evidence from the Union that it is fully qualified to enter into such an agreement in such State."

An "all-union" referendum election under the provisions of 1969 Perm. Supp., C.R.S. 1963, 80-4-6(1)(d)[3] has not been held with respect to

---

[3]Section 80-4-6(1)(d) makes it an unfair labor practice:

"(1)(d) To encourage or discourage membership in any labor organization, employee agency, committee, association or representation plan by discrimination in regard to hiring, tenure, or other terms or conditions of employment; except that an employer shall not be prohibited from entering into an all-union agreement with the representatives of his employees, in a collective bargaining unit, where three-quarters or more of his employees shall have voted affirmatively by secret ballot in favor of such all-union agreement in a referendum conducted by the director. The director shall declare any such all-union agreement terminated whenever he finds that the labor organization involved unreasonably has refused to receive as a member any employee of such employer, and each such all-union agreement shall be made subject to this duty of the director. Any person interested may come before the director, as provided in section 80-4-8, as amended, and ask the performance of this duty.

any of the collective bargaining agreements. The primary issue in this appeal is whether the provisions of the Colorado Labor Peace Act, C.R.S. 1963, 80-4-1, *et seq.* (as amended), operate to preclude enforcement of the union-security provisions contained in the various agreements.

The district court opinion recognized that federal law almost totally preempts state law in the area of labor relations, but that neither the National Labor Relations Act, 29 U.S.C. § 151, *et seq.* (1964),[4] the Labor-Management Relations Act (hereinafter the Taft-Hartley Act) — see particularly 29 U.S.C. § 164(b) (1964) — nor any other federal law preempts the provisions of the Colorado Labor Peace Act regulating "all-union" security agreements, 1969 Perm. Supp., C.R.S. 1963, 80-4-6(1)(d). The district court concluded that section 80-4-6(1)(d)[5] of the Colorado Labor Peace Act prohibits "any union security clause contained in any collective bargaining agreement as long as the clause contains any mandate which compels an employee's financial support or allegience to the labor organization regardless of name, including, but not limited to, the union shop, agency shop, modified union shop, modified agency shop, discriminatory hiring halls, maintenance of dues, maintenance of membership and the like" in the absence of a referendum election under the Colorado Labor Peace Act. The district court further found that this provision of the Colorado Labor Peace Act was applicable to employers engaged in interstate commerce doing business within the State of Colorado. The court refused to construe the provision as covering only union shop clauses. Throughout the opinion, the court emphasized that the fundamental purpose of the Colorado Labor Peace Act was to protect the right of each individual employee to determine for himself whether or not to engage in union activity. In the absence of a referendum approving the agreement, the court held that any negotiated "all-union" security agreement was invalid. The court also noted that the Colorado Labor Peace Act must be construed to allow employees the freedom to withdraw from union activity in the absence of the required referendum. On the basis of these conclusions of law, the district court declared that each of the disputed clauses here in issue was invalid and unenforceable because no all-union referendum had been conducted pursuant to 1969 Perm. Supp., C.R.S. 1963, 80-4-6(1)(d). Moreover, the court held that C.W.A. could not rely on the invalid clauses to effect a discharge of any employee refusing to comply with the terms thereof, and that the respondents lawfully refused the demands for the discharge of the employees.

---

[4]Otherwise known as The Wagner Act.
[5]Now section 80-3-108(1)(c), C.R.S. 1973.

## All-Union Agreements

Plaintiff, C.W.A. argues that the union security clauses here in issue are not "all-union agreements" because "all" of the employees of the two employers are not required to be members of a single labor organization. Correlatively, C.W.A. argues that Colorado only proscribes the "closed shop" form of union security. We disagree.

An "all-union agreement" is defined in C.R.S. 1963, 80-4-2(8)[6] as:

". . . an agreement between an employer and a collective bargaining unit representing some or all of his employees, whereby all of the employees of an employer in a craft or an establishment are required to be members of a single labor organization."

C.W.A. emphasizes the use of the word "all" in the above definition and concludes that the present union security clauses are not subject to regulation since they do not require membership in C.W.A. by "all" of the respective employers' employees in a collective bargaining unit. Generally, the instant union-security agreements fall into two categories: maintenance of membership agreements [the 1968 Plant Division and Traffic Department agreements between C.W.A. and Mountain States; and contracts C.W.A.-12 and C.W.A.-JC-12 between C.W.A. and Western Electric]; and modified agency shop agreements [the 1971 Plant and Traffic agreement between C.W.A. and Mountain States; and contracts C.W.A.-13 and C.W.A.-JC-13 between C.W.A. and Western Electric]. Under neither of the above types of agreements were all employees in the affected bargaining units required to become members of C.W.A. Moreover, "escape" periods were provided in the agreements during which time employees could sever any obligation to retain membership and/or pay dues to C.W.A.

Generally, under a maintenance of membership provision, employees who have become members of the union are required to maintain their membership in good standing as a condition of employment. The escape clause may be utilized by the employees to renounce their membership. Under an agency shop agreement, non-union employees whom the union represents as part of the collective bargaining unit must pay, as a condition of their continued employment, an amount equivalent to the sums paid by union employees for initiation fees and dues. Union membership is not required by the agency shop agreement. The present agency shop agreements were modified as a consequence of the "escape" clause features of the contracts.

---

[6]Now section 8-3-104(1), C.R.S. 1973.

■ The interpretation of "all-union agreement" which C.W.A. advances would subvert important policy declarations embodied in the Colorado Labor Peace Act. C.R.S. 1963, 80-4-4,[7] provides that employees shall be free to join or refrain from joining or assisting labor organizations: "Such rights of employees and each and all of them are essential rights and nothing herein contained shall be so construed as to infringe upon or have any operation as against or in conflict with such rights and each and all of them." C.R.S. 1963, 80-4-4.

This language evinces an intent on the part of the legislature to protect the working man's right to freely chart his own course with regard to labor organization activities. Section 80-4-6(1)(d) is a further manifestation of that legislative intent in that it severely restricts the circumstances in which an employee may be subjected to "all-union agreements." If C.W.A. were to prevail in its argument that only "closed shop" agreements are regulated by section 80-4-6(1)(d), no compulsory union provision would be subject to regulation as long as a single employee were exempt from compelled payment of dues or their equivalent. Under such circumstances, the union would be free to ignore with impunity the referendum provisions of the statute and also demand compliance with any union security device other than a closed shop agreement.

■ In view of the emphatic language contained in the legislative declaration of rights of employees, C.R.S. 1963, 80-4-4, regulation of "all-union agreements" is not limited to closed shop agreements. The fact that section 80-4-2(8) defines "all union agreement" in terms of a union "membership" requirement, and the agreements herein did not require "membership" *per se*, does not deter us from our conclusion. Compulsory monetary support of a union is the "practical equivalent" of compulsory membership. *Retail Clerks v. Schermerhorn*, 373 U.S. 746, 83 S.Ct. 1461, 10 L.Ed.2d 678 (1963); *see also NLRB v. General Motors Corp.*, 373 U.S. 734, 83 S.Ct. 1453, 10 L.Ed.2d 670 (1963). In our opinion, any financial obligation imposed upon employees pursuant to a collective bargaining agreement executed and sought to be enforced in Colorado has features of compulsory unionism and as such is to be considered an "all-union agreement" under C.R.S. 1963, 80-4-2(8).

■ We interpret the word "establishment" in 80-4-2(8) to mean a recognized or defined group of employees, not necessarily *all* of the employees in a particular collective bargaining unit. The statute expressly states that the agreement may be between an employer and a collective bargaining unit representing *"some"* of his employees. Hence, the fact that some of the employees of Mountain States or Western Electric may not have been subject to the compulsory union-security provisions in issue

---

[7]Now section 8-3-106, C.R.S. 1973.

does not exclude such provisions from regulation under 80-4-6(1)(d). Absent the requisite referendum, union-security clauses such as the ones here in issue are invalid and unenforceable under the Colorado Labor Peace Act. *But, cf., Building Construction Trades Council, AFL v. American Builders, Inc.,* 139 Colo. 236, 337 P.2d 953 (1959).

### Necessity of a "Collective Bargaining Unit"

The union-security provision of the Colorado Labor Peace Act, 1969 Perm. Supp., C.R.S. 1963, 80-4-6(1)(d), provides that encouragement of membership in a labor organization by discrimination "in regard to hiring, tenure, or other terms or conditions of employment" is an unfair labor practice. The statute, however, delineates an exception to the general rule: ". . .[A]n employer shall not be prohibited from entering into an all-union agreement with the representatives of his employees, *in a collective bargaining unit,* where three-quarters or more of his employees shall have voted affirmatively by secret ballot in favor of such all-union agreement in a referendum conducted by the director." [Emphasis added.]

C.W.A. contends that a "collective bargaining unit" as defined by the Colorado Labor Peace Act is a condition precedent to the holding of a referendum under section 80-4-6(1)(d). In our opinion, the statute plainly directs that the referendum should be conducted among the employees of a collective bargaining unit. The Colorado Labor Peace Act, C.R.S. 1963, 80-4-2(6),[8] defines "collective bargaining unit" as:

". . . an organization selected by secret ballot, as provided in section 80-4-5, by a majority vote of the employees of one employer employed within the state who vote at an election for the selection of such unit, provided that where a majority of such employees engaged in a single craft, division, department, or plant shall have voted, by secret ballot, that the employees of such single craft, division, department or plant shall constitute their collective bargaining unit, it shall be so considered. Two or more collective bargaining units may bargain collectively through the same representative or representatives where a majority of the employees in each separate unit shall have voted so to do by secret ballot, as provided in section 80-4-5."

All of the bargaining units involved in this appeal have been recognized or certified by the National Labor Relations Board, and no evidence suggests that any of them were established by a secret ballot election pursuant to section 80-4-2(6). In our view, a secret ballot election, as described by section 80-4-2(6), is the exclusive method by which a collective bargaining unit subject to the "all-union" referendum provisions of section 80-4-6(1)(d) may be recognized. Correlatively, we hold that a collective bargaining unit, as defined by section 80-4-2(6), is a condition

---

[8]Now section 8-3-104(4), C.R.S. 1973.

precedent to any labor organization's right to enter into an all-union agreement with an employer under Colorado law. Inasmuch as no secret ballot election was conducted for the purpose of establishing a collective bargaining unit authorized to enter into an all-union agreement with Mountain States and Western Electric, C.W.A. is not entitled to the enforcement of the all-union agreements provisions which are, in our opinion, invalid. Even if such an election had been held and an appropriately authorized collective bargaining unit had been established, the union security provisions here in issue would be invalid and unenforceable because of the lack of employee approval through an all-union referendum.

Federal Preemption

C.W.A. urges that this court should declare section 80-4-6(1)(d) invalid on grounds of federal preemption. C.W.A. contends that the definition of "collective bargaining unit" defined by section 80-4-2(6), and operative in section 80-4-6(1)(d), is preempted by the definition of "collective bargaining unit" contained in section 9 of the National Labor Relations Act, 29 U.S.C. § 151, *et seq.* (1964).

We agree that certification or recognition under the Federal Act is different than the recognition/definition section of the Colorado Labor Peace Act. The Colorado Labor Peace Act requires a secret ballot election conducted by the division of labor in which a majority of the employees of the employer or a majority of the employees in a craft must vote. In *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), however, the Supreme Court of the United States recognized that the duty to bargain may be established under the Federal Act by methods other than by a secret ballot election:

"The most commonly traveled route for a union to obtain recognition as the exclusive bargaining representative of an unorganized group of employees is through the Board's election and certification procedures under § 9(c) of the Act . . . . A union is not limited to a Board election, however, in addition to § 9, the present Act provides in § 8(a)(5) . . . as did the Wagner Act in § 8(5), that '[i]t shall be an unfair labor practice for an employer . . . to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9(a). Since section 9(a) in both the Wagner Act and the present Act, refers to the representative as the one "designated or selected" by a majority of the employees without specifying precisely how that representative is to be chosen, it was early recognized that an employer had a duty to bargain whenever the union representative presented "convincing evidence of majority support." ' Almost from the inception of the Act, then, it was recognized that a union did not have to be certified as the winner of a Board election to invoke a bargaining obligation; it could establish majority status by other means under the unfair labor practice provision of § 8(a)(5) — by showing convincing support, for instance, by union-called strike or by strike vote, or, as here, by possession

of cards signed by a majority of the employees authorizing the union to represent them for collective bargaining purposes.''

No one disputes that the employers in this appeal are engaged in commerce and are subject to the various provisions of the National Labor Relations Act and the Labor-Management Relations Act of 1947, as amended, 29 U.S.C. § 141, *et seq.* The federal preemption doctrine was restated in *Motor Coach Employees v. Lockridge*, 403 U.S. 274, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971), where the Supreme Court said: "The constitutional principles of preemption, in whatever particular field of law they operate, are designed with a common end in view: to avoid conflicting regulation of conduct by various official bodies which might have some authority over the subject matter."

The *Lockridge* case affirmed the principles established in *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), where the United States Supreme Court declared: "When it is clear or may fairly be assumed that the activities which a state purports to regulate are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield. To leave the states free to regulate conduct to plainly within the central aim of federal regulation involves too great a danger of conflict between power asserted by Congress and requirements imposed by state law."[9]

C.W.A. urges that the recognition or certification procedures outlined in section 80-4-2(6) of the Colorado Labor Peace Act are preempted by federal principles relating to recognition or certification of a collective bargaining unit. On this basis, C.W.A. contends that the utilization of the state certification procedures in the context of the state statute regulating union security provisions, 80-4-6(1)(d), renders the latter provision invalid and unenforceable. We need not speculate on the question of whether Colorado's procedures for establishing a collective bargaining unit are preempted by federal law in any context other than the one here in issue. We concern ourselves with the certification procedure only as it relates to the state's power to regulate union security clauses in collective bargaining agreements.

 In that context, the policies embodied in the National Labor Relations Act and the Labor-Management Relations Act have been made expressly clear by the United States Supreme Court. The regulation of union security provisions is not a matter of exclusive federal concern, but states are free to pursue their own more restrictive policies. *Algoma Plywood & Veneer Co. v. Wisconsin Employment Relations Board*, 336 U.S. 301, 69 S.Ct. 584, 93 L.Ed. 691 (1949).

---

[9]§ 7, 29 U.S.C. § 157; § 8, 29 U.S.C. § 158.

We recognize that section 8(a)(3) of the Taft-Hartley Act, 29 U.S.C. § 158(a)(3) (1964), disclaimed a national policy hostile to the closed-shop or other forms of union security agreement. *Algoma Plywood & Veneer Co., supra.*[10] Section 14(b), however, provided that:

"[N]othing in this Act shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law." 29 U.S.C. § 164(b).

According to *Algoma Plywood & Veneer Co., supra*, section 14(b) was included in the act to "forestall the inference that federal policy was exclusive in the matter of union security." *See also Retail Clerks Local 1625 v. Schermerhorn*, 375 U.S. 96, 84 S.Ct. 219, 11 L.Ed.2d 179 (1963). *See generally, Oil, Chemical & Atomic Workers International Union, AFL-CIO, et al. v. Mobil Oil Corp., et al.*, 426 U.S. 407, 92 L.R.R.M. 2737 (June 14, 1976). State power, pursuant to § 14(b), begins with the actual negotiation and execution of the type of agreement described by § 14(b). *Retail Clerks Local 1625 v. Schermerhorn, supra.* Negotiation and execution of the contested agreements between C.W.A. and Mountain States and between C.W.A. and Western Electric has occurred, and thus the state's power under § 14(b) has become operative.

The issue of a state's power to recognize or certify collective bargaining units must not be confused with the state's power to regulate union-security agreements. In *Algoma Plywood & Veneer Co., supra*, the United States Supreme Court held that "[t]he character of activities left to State regulation is not changed by the fact of certification." We

---

[10]Section 8(a)(3) reads as follows:

"It shall be unfair labor practice for an employer . . . by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: *Provided*, That nothing in this Act, or in any other statute of the United States shall preclude any employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in section 8(a) of this Act as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i) if such labor organization is the representative of the employees as provided in section 9(a), in the appropriate collective-bargaining unit covered by such agreement when made; and (ii) unless following an election held as provided in section 9(e) within one year preceding the effective date of such agreement, the Board shall have certified that at least a majority of the employees eligible to vote in such election have voted to rescind the authority of such labor organization to make such an agreement: *Provided, further*, That no employer shall justify any discrimination against an employee for nonmembership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership."

agree. In Colorado, a "collective bargaining unit" for purposes of the union security agreement provision of the Colorado Labor Peace Act, may be something different than a collective bargaining unit for other purposes of labor-management relations. In the context of section 80-4-6(1)(d), a collective bargaining unit is a unique entity which may only be established pursuant to the requirements of section 80-4-2(6). Viewed as such, the procedures for establishing a collective bargaining unit under the Colorado Labor Peace Act are merely an incident of the state's power to prohibit the application of union security agreements under the permissive grant of authority contained in § 14(b) of the Taft-Hartley Act. The application of section 80-4-2(6) to the union security provisions of the Colorado Labor Peace Act is severable from its application in other contexts of the Act.

█ A valid all-union agreement may only be entered after the establishment of a collective bargaining unit in accordance with section 80-4-2(6). Having failed to properly define such collective bargaining units prior to entering the agreements here in issue, C.W.A. cannot properly demand that the employers enforce these invalid agreements.

Prohibition Under § 14(b)

█ C.W.A. contends that states, pursuant to § 14(b), are allowed to "prohibit" but not to "regulate" union security agreements. No matter how this distinction may be interpreted, § 14(b) does allow states to prohibit the "application" of union security agreements. In *Algoma Plywood & Veneer Co., supra*, the United States Supreme Court stated:

"It is argued, however, that the effect of this section is to displace State law which 'regulates' but does not wholly 'prohibit' agreements requiring membership in a labor organization as a condition of employment. But if there could be any doubt that the language of the section means that the Act shall not be construed to authorize any 'application' of a union-security contract, such as discharging an employee, which under the circumstances 'is prohibited' by the State, the legislative history of the section would dispel it. . . ."

*See also Retail Clerks v. Schermerhorn*, 375 U.S. 96, 84 S.Ct. 219, 11 L.Ed.2d 179 (1963). The provisions of section 80-4-6(1)(d) are an important incident of the state's power to prohibit the application of union security provisions such as the ones here in issue. That power has not been supplanted by federal law.

█ The fact that § 14(b) refers to "membership" does not mean that state power to regulate union security agreements only extends so far as union or closed-shop agreements. *Retail Clerks Union v. Schermerhorn*, 373 U.S. 746, 83 S.Ct. 1461, 10 L.Ed.2d 678 (1963), held that an agreement conditioning employment upon the payment of sums equal to initiation fees and monthly dues was within the § 8(a)(3) proviso, and within the scope of § 14(b), and, thence, subject to invalidation by state law. The Court, in *Schermerhorn I*, stated that whatever may be the

status of "less stringent union-security arrangements, the agency shop is within § 14(b)." *NLRB v. General Motors Corp., supra.* The modified agency shop clauses here in issue are hardly less stringent than the agency shop clause in the first *Schermerhorn* case. The limited "escape" provisions included in these agreements were of relatively inconsequential effect when measured against the more obvious purpose of the agreements — to insure C.W.A.'s security as the exclusive bargaining representative of the employees of Mountain States and Western Electric.

In short, Colorado was entitled under § 14(b) to enact section 80-4-6(1)(d) of the Colorado Labor Peace Act, and the state's power to prohibit the application of the union security provisions here in issue is not preempted by federal law.

The enactment of § 14(b) would have been a meaningless gesture unless it was designed to affect a state's power over employers and employees engaged in interstate commerce, and that is the only circumstance in which Congress could possibly have ceded power to the states under § 14(b). Therefore, section 80-4-6(1)(d) applies to union security clauses in collective bargaining agreements negotiated and executed by multi-state employers engaged in interstate commerce and doing business in Colorado.

Accordingly, we hold that the disputed clauses of the collective bargaining agreements between C.W.A. and Mountain States and between C.W.A. and Western Electric are union security clauses subject to state control under the Colorado Labor Peace Act. As enacted, the clauses were invalid because they were not approved through an all-union referendum by an appropriately designated employee group. C.W.A. may not rely on these clauses to effectuate a discharge of an employee refusing to comply with the terms thereof. Mountain States and Western Electric lawfully refused C.W.A.'s demand that the employees be discharged.

Accordingly, the judgment of the district court is affirmed.

MR. CHIEF JUSTICE PRINGLE dissents.

MR. CHIEF JUSTICE PRINGLE dissenting:

I respectfully dissent. Since the overwhelming majority of this court feels differently than I do, I shall not write at length or in depth.

I think there is no disagreement that the National Labor Relations Act, as amended, pre-empts labor relations from state regulation except where such is specifically authorized by the Act itself. Section 14(b) of the Traft-Hartley amendment does provide that states may *prohibit*, and I emphasize the word used is *prohibit*, the execution or application of agreements requiring membership in a labor organization as a condition of employment in any state or territory. It does not, in its express language,

allow states to regulate or do anything other than prohibit such agreements.

I would recall to the majority that Taft-Hartley was passed after a rather bitter battle, and that its terms therefore, should be strictly applied. It makes sense that the compromise was that union and agency shops may be entirely prohibited by a state, but if there was to be regulation, that regulation must be uniformly applied throughout the country under the terms of the National Labor Relations Act, rather than apply 50 different standards as to how and when union and agency shops might be negotiated.

I know the time-worn legal cliche that whatever a state can prohibit it can regulate. But this is not the situation for its application. We are here dealing with original pre-emption of the entire field by the federal government and the cession back to the states of a portion of that field. As I have pointed out, the history of that cession does not permit this court to reach out, as I think it does here, to grant the state powers not expressly given it by the Act itself. I do not read *Algoma Plywood & Veneer Co. v. Wisconsin Employment Relations Board*, 336 U.S. 301, 69 S.Ct. 584, 93 L.Ed. 691 (1949) to hold otherwise. I do read several National Labor Relations Board decisions to be in accordance with my view. *Cyclone Sales, Inc.*, 115 NLRB 431 (1956); *Western Electric Co.*, 84 NLRB 1019 (1949); *Northland Greyhound Lines, Inc.*, 80 NLRB 288 (1948).