George L. SEAY et al., Plaintiffs,

v.

McDONNELL DOUGLAS CORPORATION and International Association of Machinists & Aerospace Workers, AFL–CIO, et al., Defendants.

Civ. Nos. 67–1394–HP and 71–498–HP.

United States District Court,
C. D. California.

Dec. 19, 1973.

---

Rex H. Reed, Raymond J. LaJeunesse, Jr., Washington, D. C., Jonathan C. Gibson, Gibson & Kennerson, San Diego, Cal., Joseph H. Cummins, Cummins, White & Breidenbach, Los Angeles, Cal., for plaintiffs.

Alfred M. Klein, Richard D. Brew, Rose, Klein & Marias, Los Angeles, Cal., Plato E. Papps, Washington, D. C., for defendants.

### MEMORANDUM AND ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT AND DISMISSAL

PREGERSON, District Judge.

These consolidated cases are before the court on motions for summary judgment and dismissal filed by the International Association of Machinists and Aerospace Workers, AFL–CIO, and District Lodges 1578 and 720 (collectively, the "union defendants" or the "IAM").

■ The named plaintiffs,[1] non-union employees of McDonnell Douglas Corporation or its predecessor, Douglas Aircraft Company,[2] have been required, under union security provisions of collective bargaining agreements applicable to their bargaining unit since July 23, 1962, to pay to the IAM a monthly agency fee equal in amount to the monthly dues paid to the IAM by its members.[3] Under such union security provisions, the failure to pay agency fees or union dues would subject an employee to discharge by the company.

■ Plaintiffs assert that the agency fees paid by them have been used, in part, by the IAM to support political candidates and to "propagate political and economic doctrines, concepts, ideologies, and legislative programs" which plaintiffs eschew. They charge that by using such agency fees for purposes other than those reasonably necessary and germane to collective bargaining, the union defendants have breached their fiduciary duty of fair representation. Plaintiffs seek declaratory and injunctive relief, an accounting and money damages.[4]

The parties agree that the cases before this court—i. e., the *Seay* cases—are basically the same as a parallel case that twice was before the Tenth Circuit. That parallel case is commonly called Reid v. United Automobile Workers, 443 F.2d 408 (10th Cir. 1971) ("*Reid I*"), 479 F.2d 517 (10th Cir. 1973) ("*Reid II*"), cert. den., 414 U.S. 1076, 94 S.Ct. 592, 38 L.Ed.2d 483 (1973). The *Seay* cases and the *Reid* case involve the same factual issues, the same legal issues, the same employer (McDonnell Douglas Corporation), and prayers for the same relief. (Tr. at 4–6 & 50.[5]) The named plaintiffs, the union and its counsel are different, but plaintiffs' lead counsel is the same.

The plaintiffs in *Reid,* non-union employees of McDonnell Douglas Corpora-

---

1. By an order filed March 16, 1972, this court ruled that these cases are not maintainable as class actions.

2. By an order filed June 12, 1972, this court granted defendant McDonnell Douglas Corporation's motions to dismiss the complaints for failure to state claims upon which relief can be granted.

3. A compulsory agency fee arrangement is a permissible and valid form of union security under 29 U.S.C. § 158(a)(3). N.L.R.B. v. General Motors Corporation, 373 U.S. 734, 735, 83 S.Ct. 1453, 1455, 10 L.Ed.2d 670 (1963).

4. It would appear that the appropriate remedies are injunctive relief and restitution. *See* Brotherhood of Railway & S. S. Clerks v. Allen, 373 U.S. 113, 120–122, 83 S.Ct. 1158, 1163–1164, 10 L.Ed.2d 235 (1963); International Ass'n of Machinists v. Street, 367 U.S. 740, 774–775, 81 S.Ct. 1784, 1802–1803, 6 L.Ed.2d 1141 (1961).

5. The abbreviation "Tr." refers to the Reporter's Transcript of Proceedings held before this court on October 1, 1973.

tion, filed suit in the United States District Court for the Northern District of Oklahoma against their employer and the United Automobile Workers (the "UAW"). In their complaint, filed in November 1967, the *Reid* plaintiffs alleged that "the Union used a portion of their compulsory agency fees in the support of political and economic doctrines, ideologies, and legislative programs to which they are opposed and which are not reasonably necessary to collective bargaining." *Reid II, supra,* 479 F.2d at 518. The plaintiffs sought a declaratory judgment, injunctive relief and damages.

The UAW conceded in *Reid* that:

"(1) it spends compulsory agency fees and union dues for the support of candidates for state and local office and for legislative, educational, citizenship, and social objectives of the Union, (2) it stands in a fiduciary relationship to plaintiffs and owes them the duty of fair representation, and (3) an employee who must pay agency fees as a condition of continued employment and who objects to the use of a portion of his fees for political and ideological purposes with which he disagrees has a right, after specifically informing the Union of his objection, to request and receive a pro rata rebate." *Reid II, supra,* 479 F.2d at 518.

In the *Seay* cases before this court, the IAM has now made the same concessions that the UAW made in *Reid*. (Tr. at 14 & 15.) [6]

In 1968, after the suit in *Reid* had been filed, the UAW amended Article 16, § 7, of its constitution to give "both a member and a payer of agency fees an intra-union remedy whereby he can receive a pro rata rebate of that portion of his dues or fees spent for political and ideological causes to which he objects." *Reid II, supra,* 479 F.2d at 518

Article 16, § 7, was amended to read as follows:

"Any member shall have the right to object to the expenditure of a portion of his dues money for activities or causes primarily political in nature. The approximate proportion of dues spent for such political purposes shall be determined by a committee of the International Executive Board, which shall be appointed by the President, subject to the approval of said Board. The member may perfect his objection by individually notifying the International Secretary-Treasurer of his objection by registered or certified mail; provided, however, that such objection shall be timely only during the first fourteen (14) days of Union membership and during the fourteen (14) days following each anniversary of Union membership. An objection may be continued from year-to-year by individual notifications given during each annual fourteen (14) day period.

"(b) If an objecting member is dissatisfied with the approximate proportional allocation made by the committee of the International Executive Board, or the disposition of his objection by the International Secretary-Treasurer, he may appeal directly to the full International Executive Board and the decision of the International Executive Board shall be appealable to the Public Review Board or the Convention at the option of said member." *Reid II, supra,* 479 F.2d at 518–519 n. 1.

Following the lead of the UAW, the IAM, on June 28, 1973, issued its Official Circular No. 669, which became effective on July 1, 1973. Official Circular No. 669 creates an intra-union remedy for both union members and agency fee employees who object to the use of union dues or agency fees for "activities or causes primarily political in nature"

---

6. In light of the IAM's concessions, it appears that all that remains to be done is an accounting to determine the amount of rebate which each plaintiff is entitled to receive. (Tr. at 24, 45 & 46.)

to which they object. Under that intra-union remedy, dissenters are entitled to receive a pro-rata rebate. Official Circular No. 669 is reproduced as follows:

## INTERNATIONAL ASSOCIATION OF MACHINISTS and AEROSPACE WORKERS

MACHINISTS BUILDING
1300 CONNECTICUT AVENUE, WASHINGTON, D.C. 20036

## OFFICIAL CIRCULAR NO. 669

Policy Regarding Proportional Dues Refunds to Objectors to the Use of Union Dues or Agency Fee Payments for Political Activity in the United States

### Issued: JUNE 28, 1973

## TO THE MEMBERSHIP EVERYWHERE, GREETINGS:

▶ **SUBJECT** Policy regarding proportional dues refunds to objectors to the use of union dues or agency fee payments for political activity in the United States.

▶ **BACKGROUND** In 1961, the Supreme Court held in *Street (IAM v. Street,* 367 U.S. 470) that under the Railway Labor Act a union may not, over an employee's objection, use union dues to support political causes which he opposes. However, the *Street* case did not fully resolve or explain the method by which dissenting members could secure an appropriate remedy such as a refund of a portion of their union dues, but merely held that union dues could not be used to support political causes which members opposed.

It was not until 1963 that the Court, in the *Allen* case *(B.R.A.C. v. Allen,* 373 U.S. 113), set forth a formula for such rebates of union dues. It suggested that the method of determining the amount of dues to be refunded such an objector would be (1) the refund to him or her of a portion of such dues in the same proportion that union political expenditures bear to the total union expenditures, and (2) a reduction of future dues to be paid by the objector by the same proportion.

This great union, and others as well, believe that without political action or activity the great social legislation of this century would not have passed. We need only look at a part of the record. The Railway Labor Act, the Wagner Act, Social Security, the 8-hour day, the Fair Labor Standards Act, Medicare, the Civil Rights Act, and a host of others, might easily have washed down the drain but for the concerted political activity of ours and the rest of the trade union movement. This is equally true with respect to the election of Presidents, Senators, Congressmen, Governors, and other state, city, and county officials.

In this ever-increasing complex society, such political activity on the part of this union is more than ideological dissent to be discussed only in our union halls. It is a warning bell that must be publicly heard in the halls of Congress, the White House, the state legislatures, and the Governors' mansions, and must not be silenced. However, in any democratic society, including our union, minorities must be heard as well. That lesson was made clear by the enactment of the Landrum-Griffin Act.

And, in the political arena, a minority objection to the use of any dues or agency fee payments for political purposes by our union must be honored.

▶ **POLICY** Accordingly, and effective July 1, 1973, the following policy is hereby established.

1. Any dues-paying member or non-member who is covered by a collective bargaining agreement containing a "union shop" or "agency shop" provision shall have the right to object to the expenditure of a portion of his dues or agency fees for the activities or causes primarily political in nature.

2. By action of the Executive Council, the United States members of the Committee on Law are

designated to determine the approximate annual proportion of dues spent for such political purposes. The Chairman of the Committee on Law shall preside as Chairman.

3. A member or non-member may perfect his objection by individually notifying the General Secretary-Treasurer **and** the Recording Secretary of the local or district lodge to which he belongs or to which he must pay agency shop fees by registered or certified mail; provided, however, that such objection shall be timely only during the first 14 days of union membership and during 14 days following each anniversary of union membership.

4. An objection may be continued from year to year by individual notifications as provided in paragraph 3 above and must be given during each annual anniversary 14-day period.

5. If an objecting member or agency fee payer is dissatisfied with the approximate proportional allocation made by the Law Committee, he may appeal the ruling of the Committee to the Executive Council.

6. If the objector is not satisfied with the decision of the Executive Council, he shall have the right of an appeal to the Convention in accordance with the provisions of Article "L" of the IAM Constitution.

7. Consistent with this policy, any objector who has filed in the past such a complaint with his local or district lodge shall have such objection honored retroactively, provided such objector files with the Recording Secretary **and** the General Secretary-Treasurer a copy of such letter with a current objection as provided in paragraph 3 above.

8. Whatever amount is determined by the Law Committee to be allocable for political purposes, one-half will be rebated by the affected local or district lodge and one-half by the Grand Lodge.

9. The amount of reduced dues for such objectors shall be a matter of record and so stated at the bottom of the monthly report furnished by the General Secretary-Treasurer.

10. Where there is in effect an automatic dues deduction or checkoff with an employer, the Financial Secretary or Secretary-Treasurer shall refund such dues or agency fee payments checked off by monthly check until the anniversary date of the checkoff period, and one-half of that amount rebated to the objector shall be deducted from the per capita tax forwarded to the Grand Lodge in his behalf.

11. The period of retroactivity shall be from the time that the objection has been made to the use of dues money or agency fees for political purposes.

Fraternally yours,

Eugene Glover
GENERAL SECRETARY-TREASURER

Floyd E. Smith
INTERNATIONAL PRESIDENT

[SEAL]

As stated above, *Reid* has been before the Tenth Circuit twice. The first appeal followed the district judge's dismissal of the action against the UAW on the ground that the preemption doctrine gave exclusive jurisdiction to the

National Labor Relations Board. The district judge had also dismissed the action against McDonnell Douglas for failure to state a claim for which relief could be granted. The Tenth Circuit affirmed the dismissal of the action against the employer, but reversed the dismissal of the action against the union on the ground that jurisdiction "conceivably" existed under Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), for breach of the union's duty of fair representation. *Reid I, supra,* 443 F.2d at 411–412. Under Vaca v. Sipes, a plaintiff, in order to establish a breach of the duty of fair representation, must prove that the "union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." 386 U.S. at 190, 87 S.Ct. at 916.

On remand of *Reid,* the district judge considered the effect of the intra-union rebate procedure that had been adopted after the suit had been filed and granted summary judgment in favor of the UAW. In affirming that ruling in *Reid II,* the Tenth Circuit said:

". . . . Our problem is whether the record supports a claim of unfair representation.

"Our first decision holds that plaintiffs' claim of unfair representation is sufficient to establish jurisdiction in the federal courts under the doctrine of Vaca v. Sipes, [citation omitted]. It did not determine the merit of that claim. The question of merit must be determined under the standards mentioned in *Vaca,* [citation omitted] and those stated in the later decision of Motor Coach Employees v. Lockridge, 403 U.S. 274, 299, 301, 91 S.Ct. 1909, 29 L.Ed.2d 473. If those standards are not met, the claim of unfair representation falls. The standards are whether union conduct is arbitrary, discriminatory or in bad faith, 386 U. S. at 190, 87 S.Ct. 903, and whether there is fraud, deceit, dishonest conduct, or discrimination that is intentional, severe, and unrelated to legitimate union activities. 403 U.S. at 299, 301, 91 S.Ct. 1909.

"In the record before us we find no facts establishing discrimination, fraud or dishonesty. Plaintiffs, by speculative, conclusionary, and argumentative statements condemn the Union remedy [*i. e.,* the intra-union rebate procedure contained in Article 16, § 7, of the UAW constitution] as unfair, unreasonable, and unworkable. Those statements do not suffice to create an issue of fact. [Citations omitted]. We have no concrete particulars to sustain any of the elements which the Supreme Court says are pertinent to a claim of unfair representation. At the most the statements are conjectures as to how the union remedy might work in imagined circumstances.

"We attach no significance to the fact that the Union remedy is provided by a constitutional amendment adopted during the pendency of this litigation. It may be true that the Union saw the handwriting on the wall and decided that under Street and Allen some remedy must be made available. The question is whether that remedy, on its face, negates the unfair representation charge. We believe that it does." 479 F.2d at 520.

One of the *Seay* cases (Docket No. 67–1394–HP) has already been before the Ninth Circuit. Seay v. McDonnell Douglas Corporation, 427 F.2d 996 (9th Cir. 1970). That appeal was from this court's order dismissing the complaint for lack of jurisdiction on the ground that the subject matter of the suit was within the exclusive primary jurisdiction of the National Labor Relations Board. *Id.,* at 998. In reversing this court, the Ninth Circuit held that the complaint could be read to allege a violation of the duty of fair representation and that 29 U.S.C. § 185(a) supports jurisdiction. *Id.,* at 1001. The IAM now asks this court, in light of Circular No. 669, to follow the Tenth Circuit's decision in *Reid II* by granting the pending motions for summary judgment. Plain-

tiffs assert that this court is precluded from following the Tenth Circuit; they argue that in Seay v. McDonnell Douglas Corporation, *supra,* the Ninth Circuit held as a matter of law that the IAM has breached its duty of fair representation to plaintiffs. Therefore, plaintiffs contend, this court may not find, as did the Tenth Circuit in *Reid II,* that the adoption of an intra-union rebate procedure by the IAM negates the charge of unfair representation. This court does not read the Ninth Circuit's decision as a ruling on the merits; as stated above, the decision simply holds that the complaint could be read to allege a violation of the duty of fair representation and therefore that this court has jurisdiction

In adopting, albeit belatedly, an intra-union procedure which provides rebates to dissenters, the IAM has apparently reconciled itself at last to the Supreme Court's decisions in International Ass'n of Machinists v. Street, 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961), and Brotherhood of Railway & S.S. Clerks v. Allen, 373 U.S. 113, 83 S. Ct. 1158, 10 L.Ed.2d 235 (1963). In *Street,* the Supreme Court held that § 2, Eleventh, of the Railway Labor Act, 45 U.S.C. § 152, Eleventh, prohibits the exaction of funds from employees for the support of political causes to which they object.[7] The Ninth Circuit has held

---

7. The line separating union expenditures germane to collective bargaining from expenditures that are "political" is difficult to draw. On June 9, 1972, this court addressed that subject and, from the bench, said:

" . . . . At this point in the lawsuit, I want to issue a ruling regarding where the line shall be drawn separating expenditures that are germane to collective bargaining and expenditures that are political and to which as a result dissenters need not contribute.

"Quite obviously, this is a difficult question to decide. The Supreme Court was not called upon to decide it in *Street* and *Allen.* Furthermore, I know of no cases in which lower courts have tried to answer that question. Therefore, this is a problem that this court needs to face up to.

"And just to make a few observations, it seems to me that where the line is drawn has very serious implications for the activities of the American labor: movement and for the future of that movement. It appears to me that one would have to be blind to history not to understand that political activities in a sense are the blood and sinew of the American labor movement.

"In my view, political activities are germane to collective bargaining in many ways. I think that when labor sits down at the bargaining table with management, part of each side's bargaining strength is based on its political strength, on the legislation under which it operates, and on its political support in Congress and in State legislatures and in the city councils. This applies, of course, to both labor and management.

"The problem that this court has is how to reconcile the rights of dissenters in a union shop with the right of the union and its members to engage in political activities. The court also believes that the role of majority rule in unions, as it exists under the Landrum-Griffin Act, is relevant here.

"In a sense, there is an ecological balance that exists in this country between labor and management. I feel that any case which would have the effect of seriously disturbing that balance ought to be considered with great caution and with great deliberation. In a sense, I feel, that balance has made this country great and strong and prosperous.

"Now, I have examined the British Trade Union Act, which is appended to the Supreme Court's decision in *Allen,* and I have also examined the Hatch Act and the regulations promulgated under it by the Civil Service Commission. I have examined the ·Federal Corrupt Practices Act, 18 U.S.C. Section 610, and Section 162(e) of the Internal Revenue Code and the regulations promulgated under it by the Internal Revenue Service. I have considered the implications of each of these statutes for defining an appropriate sphere for union political activities.

"Now, based upon my consideration of these statutes and of *Street* and *Allen* and of the other relevant court decisions, this is where I am thinking of drawing the line. Dissenting employees in an agency fee situation should not be required to support financially union expenditures as follows:

"One, for payments to or on behalf of any candidate for public office in connec-

that the Supreme Court's message in *Street* applies to cases arising out of the applicable provision of the National Labor Relations Act, 29 U.S.C. § 158(a)(3). Seay v. McDonnell Douglas Corporation, *supra*, 427 F.2d at 1003. In *Allen,* the Supreme Court suggested that the union defendants "consider the adoption by their membership of some voluntary plan by which dissenters would be afforded an internal union remedy" and then concluded its opinion by reminding "the parties of the availability of more practical alternatives to litigation for the vindication of the rights and accommodation of interests . . . involved." 373 U.S. at 122–124, 83 S.Ct. at 1164.

The intra-union remedy established by the IAM's Circular No. 669 essentially tracks the intra-union remedy embodied in Article 16, § 7, of the UAW constitution. There is, however, a minor difference. Under Article 16, § 7, the final intra-union appeal may be taken to "the Public Review Board or the Convention at the option" of the dissenter. Under Circular No. 669, the final intra-union appeal may be taken "to the Convention in accordance with the provisions of Article 'L' of the IAM Constitution." The Tenth Circuit concluded in *Reid II* that the remedy provided by Article 16, § 7, "is a good faith effort to comply with the teachings of Street and Allen." 479

F.2d at 520. The fact that Article 16, § 7, gives a dissenter the option of going to the Convention or the Public Review Board, while Circular No. 669 omits that option and instead requires an appeal to the Convention, does not preclude this court from concluding that Circular No. 669 is, at least on its face, a good faith effort by the IAM to comply with *Street* and *Allen.*

 Plaintiffs have attacked the Circular No. 669 procedure—which is available to union and non-union employees alike—on the ground that it makes the union the "judge and the jury" of what is or is not a proscribed political activity. However, that criticism can be leveled at all intra-union remedies; by definition, they involve conflicts between the union and its membership. Moreover, in *Allen* the Supreme Court encouraged unions to establish an internal union remedy, despite the fact that the plaintiffs in that case were non-union employees. Therefore, the fact that the plaintiffs herein are not union members does not preclude the IAM from satisfying the duty of fair representation owed to plaintiffs by establishing an internal union remedy. As long as the IAM is not administering the Circular No. 669 procedure in a manner that is "arbitrary, discriminatory, or in bad faith," it is not in breach of its duty of fair representation. Vaca

---

tion with his campaign for election to such public office, or

"Two, for payments to or on behalf of any political party or organization, or

"Three, for the holding of any meeting or the printing or distribution of any literature or documents in support of any such candidate or political party or organization.

"Those are the three areas that fall within the line of—for want of a better term, we can characterize as—I don't know whether the expression 'proscribed activities' is apt or not, but it is within those areas that dissenting employees should not be required to support financially union expenditures.

"Now, as to expenditures for other purposes, regardless of their political nature, if that is the proper characterization, I feel that they are sufficiently germane to

collective bargaining to require dissenting employees who are subject to union shop or agency fee agreements to bear their share of that burden.

"Now, that, gentlemen, is where this court is thinking of drawing the line. It is not an easy line to draw. It is a line that, to my knowledge, no court to date has been required to draw. So that takes care of that issue."

Circular No. 669 provides that a dissenter "shall have the right to object to the expenditure of a portion of his dues or agency fees for the activities or causes *primarily political in nature.*" [Emphasis added.] As a result, the IAM intends to employ a broader definition of political activity than that contemplated by the court's order of June 9, 1972. (Tr. 10–11, 17–21, 27–29, 34–36.)

v. Sipes, *supra*, 386 U.S. at 190, 87 S.Ct. at 916; *see also* Brotherhood of Railway & S.S. Clerks v. Allen, *supra*, 373 U.S. at 122–124, 83 S.Ct. at 1164.

The internal union remedy embodied in Circular No. 669 is available to each plaintiff retroactively for a period of up to four years prior to the filing of the complaints in these actions. (Tr. at 17.) In addition, the IAM has acknowledged that it will deem each plaintiff in the *Seay* cases, by virtue of having brought this suit, to have timely filed the appropriate objections and notices with the appropriate union officials; the plaintiffs herein will not, in other words, be required to file an initial objection under Circular No. 669. Nevertheless, none of the plaintiffs have sought to use this remedy or test its fairness, although each of them has been given adequate notice of its availability. As a result, plaintiffs' objections to the remedy are, as was observed in *Reid II*, "[a]t the most . . . conjectures as to how the union remedy might work in imagined circumstances." 479 F.2d at 520.

The *Reid* case and the *Seay* cases are virtually formed from the same template; the undisputed facts and the issues of law are practically identical. This court believes that the Tenth Circuit's reasoning in *Reid II* is sound. Accordingly, this court concludes that the intra-union remedy provided by IAM Circular No. 669 is a good faith effort to comply with *Street* and *Allen*. It is, at least on its face, a fair, reasonable and adequate intra-union procedure. *See* International Association of Machinists v. Friedman, 102 U.S.App.D.C. 282, 252 F.2d 846 (1958), cert. den., 357 U.S. 926, 78 S.Ct. 1370, 2 L.Ed.2d 1370 (1958); Brady v. Trans World Airlines, Inc., 401 F.2d 87 (3rd Cir. 1968), cert. den., 393 U.S. 1048, 89 S.Ct. 680, 21 L.Ed.2d 691 (1969). It appears adequate to provide each plaintiff with the relief to which he is entitled under *Street* and *Allen*. It negates the charges of a breach of the duty of fair representation.

There being no genuine issue as to any material fact, defendants' motions for summary judgment are granted, and these cases are dismissed.