Howard ELLIS, et al.,
Plaintiffs/Appellants,

v.

BROTHERHOOD OF RAILWAY, AIR-LINE AND STEAMSHIP CLERKS, FREIGHT HANDLERS, EXPRESS AND STATION EMPLOYEES, et al., Defendants/Appellees.

Allen FAILS, et al.,
Plaintiffs/Appellants,

v.

BROTHERHOOD OF RAILWAY, AIR-LINE AND STEAMSHIP CLERKS, FREIGHT HANDLERS, EXPRESS AND STATION EMPLOYEES, et al., Defendants/Appellees.

Nos. 80–5562, 80–5603.

United States Court of Appeals,
Ninth Circuit.

Argued Nov. 2, 1981.

Decided Feb. 22, 1982.

Decided Sept. 3, 1982.

Michael E. Merrill, San Diego, Cal., for Ellis et al.

Joseph Rauh, Laurence Gold, Washington, D. C., argued, for Broth. of Railway, et al.; Joseph L. Rauh, Jr., Rauh, Silard & Lichtman, Washington, D. C., William J. Donlon, Rockville, Md., on brief.

Marsha S. Berzon, San Francisco, Cal., J. Albert Woll, Washington, D. C., for amicus curiae.

Before PREGERSON and ALARCON, Circuit Judges, and WHELAN,* District Judge.

PREGERSON, Circuit Judge:

## BACKGROUND

The Railway Labor Act, as amended in 1951, permits employers engaged in interstate rail or air commerce to include in collective bargaining contracts either a union shop or an agency fee provision. Railway Labor Act, § 2, subd. 11, 45 U.S.C. § 152, subd. 11 (hereafter "Section 2, Eleventh"). A union shop provision requires employees to join the union that represents their craft or class. 45 U.S.C. § 152, subd. 11(a). An agency fee provision requires employees to pay the union a fee equal to union dues, initiation fees, and assessments, but does not require employees actually to join the union. 45 U.S.C. § 152, subd. 11(b). Such provisions prevent "free riders" from reaping the benefits of collective bargaining without contributing financial support to the union's efforts. In *Railway Employees' Department v. Hanson*, 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1956), the Supreme Court upheld the constitutionality of such financial support requirements, specifically rejecting contentions that a union shop provision violated the First and Fifth Amendment rights of protesting employees.

Five years later, in *International Association of Machinists v. Street*, 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961), the Court reaffirmed *Hanson*, but construed the Railway Labor Act as prohibiting the union from using any portion of an employee's mandatory dues to support political and ideological causes once the employee has informed the union of his or her objection to those expenditures. That construction allowed the Court to avoid deciding the First Amendment challenge to the use of union dues to support political activities. That issue was not faced until 1977 when, in *Abood v. Detroit Board of Education*, 431 U.S. 209, 234, 97 S.Ct. 1782, 1799, 52 L.Ed.2d 261 (1977), the Court ruled that the First Amendment prohibits a union from financing political and ideological causes not germane to collective bargaining duties by using a portion of the dues of employees who object to advancing those causes.[1]

The instant action commenced in 1973, when appellants, a group of Western Airlines employees, challenged the dues payment obligation imposed by a union shop agreement.[2] The appellants contended that

---

* The Honorable Francis C. Whelan, Sr., United States District Judge, for the Central District of California, sitting by designation.

1. *Hanson* recognized that the existence of union shop contracts raised "justiciable questions under the First and Fifth Amendments," 351 U.S. at 232–33, 76 S.Ct. at 718, but held that an employee could be required constitutionally to support the work of the union in the realm of collective bargaining. *Id.* at 235, 76 S.Ct. at 719. *Abood* prohibited the use of a protesting employee's dues to finance political causes not germane to the union's collective bargaining duties. The Court based its holding on the

right of association guaranteed by the First and Fourteenth Amendments—but made no reference to any Fifth Amendment prohibition against such use of union dues. There is therefore no support for the employees' allegation in the instant case that BRAC's expenditures infringe upon their Fifth Amendment rights.

2. There were originally two separate actions, both filed in 1973. *Fails v. BRAC* was brought by employees who unwillingly joined BRAC to comply with a union shop agreement. *Ellis v. BRAC* was brought by employees hired prior to the effective date of the union shop agreement. The *Ellis* plaintiffs did not have to join the

they could not be required to contribute to any union costs except those incurred for collective bargaining and grievance administration activities. They urged the district court to define the scope of those activities narrowly. Such a construction would entitle them to a substantial dues rebate.

In October 1975, the union (Brotherhood of Railway, Airline and Steamship Clerks, Freight Handlers, Express and Station Employees, hereafter "BRAC") instituted a retroactive voluntary rebate program for employees who object to the use of a portion of their dues to support certain political or ideological causes not germane to collective bargaining. BRAC asserts that this rebate plan protects appellants' rights under *Street* and *Abood* with respect to union activities conceded by all to be "political" or "ideological."

Appellants contend that the plan still violates their First Amendment rights because it provides a rebate rather than an immediate dues reduction, thereby giving the union use of a portion of their dues for up to a full year. They also argue that the union kept inadequate records and could not account accurately for its expenditures.

Appellants next argue that they cannot be charged for certain major operating expenditures of the union. These expenditures were incurred for union activities that include: 1) Grand Lodge conventions; 2) Grand Lodge litigation not having as its subject matter contract negotiation or administration; 3) Grand Lodge publications; 4) Grand Lodge social activities; 5) Grand Lodge death benefits; and 6) Grand Lodge organizing activities. Expenditures for these activities are not "political" or "ideological" and thus not governed by the narrow holdings of *Street* and *Abood*. Nonetheless, appellants interpret language in those and other opinions as indicating that such expenditures are not a part of the

collective bargaining and grievance administration costs to which objecting employees can be required to contribute. BRAC responds that these activities are sufficiently germane to the collective bargaining process so that all employees under a union shop or agency fee arrangement should be required to shoulder their fair share of the cost of these traditional union activities.

In 1976, the district court granted appellants' summary judgment motion, holding in paragraph twenty-two of its ruling that the major operating expenditures in question (denominated "Paragraph 22" expenditures or activities) were not incurred for collective bargaining activities. The court thus ruled as a matter of law that protesting employees could not be forced to support the activities listed above through compulsory dues payments. BRAC sought 28 U.S.C. § 1292(b) certification, arguing that the district court's ruling, which covered the liability issues, extended a dissenter's entitlement to a rebate beyond the area of political and ideological expenditures. The district court issued the certification but this court declined to hear the matter until after a trial on the damages issues. (*BRAC v. Ellis*, No. 76–8143, June 7, 1976.)

The district court tried the damages claims in 1978. With respect to certain expenditures, conceded by the union to be political and ideological, the court held that the union's rebate plan fully protected plaintiffs' interests. The court then found that approximately forty per cent of the Grand Lodge's annual expenditures had been for Paragraph 22 activities, *i.e.*, the six activities listed above. The court ruled that these expenditures, as well as minimal Paragraph 22 expenditures made by the Local Lodges and intermediate System Boards, had to be refunded to protesting employees.[3]

---

union, but were required to pay an agency fee equal to the union's initiation fee and union dues. The two actions were consolidated in early 1974.

**3.** The court found that the Local Lodges engaged in "almost no" Paragraph 22 expendi-

tures; by stipulation, plaintiffs were awarded $1.00 per year from dues paid to their Local Lodge. The court likewise found that the System Boards engaged in "little" Paragraph 22 activity. Each plaintiff was awarded a rebate of approximately $4.00 for 1975 and 1976, and

The protesting employees appealed the decision, contending: (1) that the court erred in declining to adjudicate their First Amendment claims; 2) that the court applied the wrong standard of proof; 3) that the damages award is inadequate because the court did not require the union to account accurately for its expenditures; 4) that the court erred in cutting off plaintiffs' discovery rights six months before trial; and 5) that the court erred in refusing to consider evidence uncovered by plaintiffs after the trial but before judgment had been rendered.

The union challenged the court's summary judgment ruling that the six activities enumerated in Paragraph 22 are not germane to collective bargaining.

## I. BRAC'S EXISTING POLITICAL–IDE-OLOGICAL REBATE PLAN

In *BRAC v. Allen*, 373 U.S. 113, 83 S.Ct. 1158, 10 L.Ed.2d 235 (1963), the Supreme Court grappled with the problem of providing a practical and adequate remedy to employees who object to a union's political and ideological expenditures. The Court stated: "The difficulties in judicially administered relief ... should, we think, encourage petitioner unions to consider the adoption by their membership of some voluntary plan by which dissenters would be afforded an internal union remedy." *Id.* at 122, 83 S.Ct. at 1163.

Pursuant to that suggestion, BRAC instituted a voluntary rebate plan in late 1975. Under the program, a protesting employee receives a rebate on his or her pro rata share of all union disbursements for political and ideological activity as well as all legislative and lobbying costs, charitable donations, and fees for affiliations with other labor organizations. The Grand Lodge computes the rebate based on information submitted by subordinate units and on reports submitted by Grand Lodge personnel concerning time and funds spent for political and ideological purposes. Any employee who believes his or her rebate inadequate may appeal directly to an independent Pub-

lic Review Board authorized to make final determinations on such appeals.

In Findings of Fact and Conclusions of Law rendered after the trial, the district court held that BRAC's voluntary rebate plan constituted a good-faith effort to comply with the requirements imposed by the United States Supreme Court in *Street* and *Allen.*

### A. Appellants' Constitutional Challenge to the Plan

■ Appellants challenge the court-approved plan, arguing that it does not protect their First Amendment right to abstain from contributing in the first place to the union's political activities. The program fails to pass constitutional muster, they contend, because it allows the union to collect and retain the full amount of a protesting employees' dues, use part of the dues for objectionable purposes, but not pay the rebate until the following year.

This claim is meritless. In *Street*, the court avoided adjudicating a First Amendment challenge to § 2, Eleventh of the Railway Labor Act by holding that the Act itself prohibited unions from forcing employees to support political causes which they oppose. 367 U.S. at 764, 81 S.Ct. at 1797. The Court then suggested two possible remedies to protect a dissenting employee, one of which was to provide "*restitution* to each individual employee of that portion of his money which the union expended, despite his notification, for the political causes to which he had advised the union he was opposed." *Id.* at 775, 81 S.Ct. at 1803. (Emphasis added.) By definition, an act of restitution entails the return of something—in this case, the rebate of a portion of the protesting employees' dues.

*Abood* squarely faced the constitutional issue avoided in *Street* and held that union members "may constitutionally prevent the Union's spending a part of their required service fees to contribute to political candidates and to express political views unrelated to its duties as exclusive bargaining rep-

$1.00 per year for all other years from the date of his or her original protest.

resentative." 431 U.S. at 234, 97 S.Ct. at 1799. *Abood* then cited *Allen's* suggestion that a voluntary internal union remedy would be appropriate and deferred further judicial proceedings pending implementation of the plan. *Id.* at 240–42, 97 S.Ct. at 1802–03. The rebate remedy formulated to avoid statutory violations was thus approved to protect against constitutional violations as well.

The Ninth Circuit has also approved the concept of a rebate plan as an effective safeguard of employees' rights. In *Seay v. McDonnell Douglas Corp.*, 533 F.2d 1126, 1131 (9th Cir. 1976), the court acknowledged that a rebate plan adopted the procedure outlined in *Allen*, and then held that the district court (Pregerson, J.) erred in granting summary judgment solely because there was a disputed question of fact whether the union would administer the rebate program in good faith. *Id.* at 1132. In the instant case, the fairness of the plan has been fully litigated.[4] The district court found that BRAC's rebate plan vindicated plaintiffs' rights. No showing has been made that this finding was clearly erroneous, and we refuse to disturb it.

### B. *The Standard of Proof Issue*

■ Appellants next assert—apparently with respect both to the rebate plan and Paragraph 22 expenditures—that the district court applied the wrong standard of proof. This claim is also without merit. Under *Allen, supra,* the union does bear the burden of proving the proportion of political to total union expenditures when employees protest the purpose of certain expenditures. 373 U.S. at 122, 83 S.Ct. at 1163. Generally in a civil case, the party with the burden of proof must persuade the trier of fact by a preponderance of the evidence. *Barr Rubber Products Co. v. Sun Rubber Co.,* 425 F.2d 1114, 1120 (2d Cir. 1970), *cert. denied,* 400 U.S. 878, 91 S.Ct. 118, 27 L.Ed.2d 115. *See also* E. Cleary, *McCormick's Handbook on the Law of Evi-*

dence § 339 (1972). The district court applied the preponderance of evidence standard in the instant case. Appellants, however, contend that a higher standard of proof—proof by clear and convincing evidence—was required. In support of this contention they cite an unpublished opinion of the District Court of Maryland, *Beck v. C. W. A.,* M–76–839 (D.Md.1980). The *Beck* case was factually analogous to this case— it, too, was a spending protest—and the Special Master applied the clear and convincing evidence test "in view of the constitutional issues involved." However, the *Beck* Special Master did so relying solely on *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), a plurality opinion which held that a certain type of libel action had to be proved by clear and convincing evidence. That holding was extremely narrow and was not intended to extend to every case involving a constitutional claim. More importantly, *Rosenbloom* has been overruled on that very point. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). It is true that the higher burden of proof by clear and convincing evidence is appropriate in a limited range of civil actions—for example, to prove charges of fraud and undue influence, see *McCormick supra* at § 340(b)—but it is incorrect to assert that the higher burden is required every time a "constitutional issue" is involved. The trial court properly applied the preponderance of the evidence standard.

### C. *The Accounting Challenge*

■ Appellants next assert that the district court's decision that the voluntary rebate plan protects their abstention rights was clearly erroneous because the court did not require the union to conform its books and records to generally accepted accounting principles. As a result, the objecting employees argue, BRAC was unable to satisfy its *Allen* burden of proving the proportion of political to total union expenditures.

---

4. Indeed, BRAC's program, by rebating such expenditures as charitable donations and fees for affiliations with other labor organizations, refunds more than the McDonnell Douglas/International Association of Machinists plan impliedly approved by *Seay.*

This claim is equally without merit. Immediately after it imposed the burden of proof on unions, the *Allen* court expressly stated that "[a]bsolute precision in the calculation of such proportion is not, of course, to be expected or required; we are mindful of the difficult accounting problems that may arise." 373 U.S. at 122, 83 S.Ct. at 1163. In this case, the district court recognized that its Paragraph 22 ruling would be appealed and thus declined to require the union to redo its recordkeeping procedures. BRAC did produce voluminous financial records and its witnesses explained the union's accounting methods in detail.

## II. APPELLANTS' CLAIM OF PROCEDURAL ERRORS

### A. *Termination of Discovery*

Appellants argue that the court abused its discretion when it halted discovery six months prior to trial. The court knew, appellants assert, that they intended to move to compel further answers with respect to the deposition of the union's president. They contend that BRAC obstructed efforts to obtain information throughout the discovery process. They also contend that they were left with no way to investigate the amounts of their on-going damages. Finally, they assert that the discovery ban deprived them of access to information pertaining to two of the union's trial exhibits.

■ A district court has wide latitude in controlling discovery; its rulings will not be overturned in the absence of a clear abuse of discretion. *Canadian American Oil Co. v. Union Oil Co. of California*, 577 F.2d 468, (9th Cir. 1978), *cert. denied* 439 U.S. 912, 99 S.Ct. 283, 58 L.Ed.2d 258. Appellants have failed to show any such abuse of discretion. As BRAC points out, appellants conducted extensive discovery for five years, including a full two years following the court's summary judgment ruling on Paragraph 22 expenditures. Moreover, the discovery ban was handed down on the scheduled date of the pre-trial conference; the court's ruling was, therefore, consistent with its Local Rule 9(d), then in effect, which specified that discovery "shall be completed, if possible, prior to the pre-trial conference."

### B. *Denial of Motion to Supplement the Record*

Appellants contend that the trial court abused its discretion by refusing to receive post-trial evidence of a $20.00 BRAC assessment imposed on every employee to support a national strike against a different employer, the Norfolk and Western Railway. Appellants assert this expenditure should be rebated. They brought a motion to supplement the record based on F.R.Civ.P. 59, which allows the grant of a new trial on all or part of the issues under certain circumstances, and on F.R.Civ.P. 60(b)(2), which allows the court to set aside a judgment when there is newly discovered evidence which by due diligence could not have been discovered earlier. Appellants contend that the offered evidence would demonstrate that part of the court's prospective relief—a $1.00 per year rebate from the Local Lodges and System Board—was grossly inadequate.

■ A motion to reopen to submit additional evidence is addressed to the sound discretion of the trial judge. *Berns v. Pan American World Airways, Inc.,* 667 F.2d 826, 829 (9th Cir. 1982) and cases cited therein. The denial of a motion to vacate under F.R.Civ.P. 60(b) will be reversed only upon a clear showing of abuse of discretion. *United States v. Russell*, 578 F.2d 806, 807 (9th Cir. 1978). The same is true with respect to a motion to supplement the record brought under F.R.Civ.P. 59. *Johnson v. United States*, 270 F.2d 488, 492 (9th Cir. 1959), *cert. denied*, 362 U.S. 924, 80 S.Ct. 678, 4 L.Ed.2d 743 (1960). We do not believe the district court abused its broad discretion. As the union points out, the costs of a strike are germane to collective bargaining since a strike is one of the central methods employed in collective bargaining for improving wages and working conditions. The assessment in question should not be included in any rebate; the trial court's decision was therefore correct.

## III. THE DISTRICT COURT'S PARAGRAPH 22 RULING

■ In reviewing the district court's Paragraph 22 ruling, we are faced with a definitional problem: Are the challenged union costs political-ideological expenditures that cannot be charged to protesting employees, or are such expenditures sufficiently germane to collective bargaining, so that all employees under a union shop or agency fee agreement must contribute toward their payment? A leading labor law casebook has described this issue as "the elusive problem left unresolved by the Supreme Court of defining the kinds of 'political' expenses which cannot lawfully be taxed against an unconsenting employee." A. Cox, D. Bok, R. Gorman, *Labor Law* 1184 (1977). The district court ruled on summary judgment that, as a matter of law, protesting employees cannot be required to help defray the union's expenditures challenged by the instant case. These conclusions of law are subject to *de novo* review. *State ex rel. Edwards v. Heimann*, 633 F.2d 886, 888 n.1 (9th Cir. 1980).

Neither the Supreme Court nor the Ninth Circuit has considered the precise issue presented here. The Supreme Court, however, has used a variety of terms to delineate the extent of the dues obligation that can properly be imposed on a dissenting employee. Appellants urge a narrow formulation of the dues requirement based on a statement in *Street* that "§ 2, Eleventh [of the Railway Labor Act] contemplated compulsory unionism to force employees to share the costs of negotiating and administering collective agreements, and the costs of the adjustment and settlement of disputes." 367 U.S. at 764, 81 S.Ct. at 1797. Without explanation, appellants contend that this statement demonstrates the Court's intent to restrict a dissenting employee's support obligation to those specific union functions.

Language in other Supreme Court decisions supports a broader concept of collective bargaining. *Allen* refers to the obliga-

tion to support "activities *germane* to collective bargaining," 373 U.S. at 122, 83 S.Ct. at 1163 (emphasis added); *Abood* cited that language with approval, 431 U.S. at 239 n.40, 97 S.Ct. at 1802 n.40. *Hanson* noted that an employee has the duty to support the "work of the union *in the realm* of collective bargaining." 351 U.S. at 235, 76 S.Ct. at 719 (emphasis added). *Hanson* also acknowledged that Congress has the power "to require ... the beneficiaries of trade unionism to contribute to its costs," *id.*, and specifically upheld "the requirement for financial support of the collective-bargaining agency by all who receive the benefits of its work." *Id.* at 238, 76 S.Ct. at 721. These words support a broader definition of the collective bargaining concept than that urged by appellants.

*Abood* recognized that "[t]here will, of course, be difficult problems in drawing lines between collective-bargaining activities, for which contributions may be compelled, and ideological activities unrelated to collective bargaining, for which such compulsion is prohibited." 431 U.S. at 236, 97 S.Ct. at 1800. In *Abood*, because the issues had not been fully briefed, the court declined to determine which of the activities in question might fall outside the union's duties as exclusive bargaining representative or involve constitutionally protected rights of association. 431 U.S. at 236 n.33, 97 S.Ct. at 1800 n.33.

■ Supreme Court decisions thus have avoided delineating the boundaries of acceptable mandatory dues provisions in collective bargaining agreements. Circuit court decisions are equally silent on the subject. Based on our reading of *Hanson, Allen,* and *Abood,* however, we believe that the relevant inquiry is whether a particular challenged expenditure is germane to the union's work in the realm of collective bargaining. This formulation respects and protects dissenters' rights, but does not needlessly weaken the union, whose viability is necessary to secure and maintain industrial peace.[5] Applying this test, we be-

---

5. The only prior attempt by a court in this circuit to draw the line separating "political"

expenditures from those related to collective

lieve that the district court was incorrect in holding that protesting employees cannot be charged for the union's operating expenditures at issue here. We now turn to an item-by-item analysis of the expenditures involved in this case.

## A. Grand Lodge Conventions

 BRAC represents 200,000 employees throughout the country. The Grand Lodge is either in charge of or directly involved in negotiating the collective bargaining agreements pertaining to most of those employees. The quadrennial convention is an important forum for rank and file participation in determining the Grand Lodge's collective bargaining policies. For example, the major portion of a recent convention was devoted to reports, debates, and voting on contract bargaining, grievance handling, and employee wage and benefit issues. Other significant items of business included the election of national officers and decisions concerning the union's internal structure and fiscal management. Such activities guide the union's approach to collective bargaining and are directly

related to its effectiveness in negotiating labor agreements.[6]

## B. Grand Lodge Litigation

Paragraph 22 exempts the vast majority of the union's litigation expenditures from protesting employees' dues obligations. While the exempted cases did not pertain to any specific collective bargaining agreement or grievance, they did involve such things as: the union's challenge to the legality of the airline industry's Mutual Aid Pact, under which a struck carrier receives substantial financial assistance from non-struck carriers; the protection of employees' rights during bankruptcy proceedings involving an employer; the doctrine of fair representation; and the defense of suits alleging violation of the non-discrimination requirements of Title VII.

The aim of the Mutual Aid Pact litigation was to strengthen the union's ultimate collective bargaining weapon—the ability to engage in an effective strike, which is thwarted considerably if the struck carrier continues to receive substantial income from non-struck carriers.

---

bargaining was made in dictum in the district court's decision in *Seay v. McDonnell Douglas Corp.*, 371 F.Supp. 754, 761–62 n.7 (C.D.Cal. 1973), (Pregerson, J.) *rev'd on other grounds*, 533 F.2d 1126 (9th Cir. 1976). There, the court described a range of "political" expenditures to which an objecting employee could not be required to contribute. The court based its test on the holdings of *Street* and *Allen* and on an analysis of similar provisions in the British Trade Union Act appended to the *Allen* decision. The excluded political expenditures were:

> One, for payments to or on behalf of any candidate for public office in connection with his campaign for election to such public office, or
>
> Two, for payments to or on behalf of any political party or organization, or
>
> Three, for the holding of any meeting or the printing or distribution of any literature or documents in support of any such candidate or political party or organization . . . .

*Id.* Any other expenditures, the court concluded, "regardless of their political nature," would be "sufficiently germane to collective bargaining to require dissenting employees who are subject to union shop or agency fee agreements to bear their share of the burden." *Id.* The *Seay* formulation thus specifically defines "political" expenditures and excludes only those

items from an employee's dues-paying obligation.

This test has been quoted in a recent treatise, R. Gorman, *Labor Law* 659 (1977) and in a recent casebook, A. Cox, *et al., Labor Law* 1184–85 (1977). We find it unnecessary to embrace *Seay's* test because we conclude that the union's operating expenditures in question here are not just non-political and non-ideological, but can be justified individually as germane to the work of the union in the realm of collective bargaining.

**6.** Furthermore, the convention achieves compliance with Section 401(a) of the Labor-Management Reporting and Disclosure Act, 29 U.S.C. § 481(a), which requires unions to elect officers at least once every five years by referendum or convention. Like most other national unions, BRAC elects at conventions rather than by referendum. BRAC asserts that the convention is more workable than the referendum option, which takes more time away from union business for campaigning, and ultimately can cost more. It would lead to highly anomalous results if federal legislation made conventions necessary but federal courts did not require employees to contribute to convention costs.

In several cases, BRAC's intervention in an employer's bankruptcy proceedings protected the union members' wages and ensured continued compliance with the collective bargaining agreement while the employer underwent reorganization.

The district court's ruling would give objecting employees a free ride as to these non-political expenses, which are related to the union's work as the collective bargaining agent.

## C. Grand Lodge Publications

The monthly magazine of the Grand Lodge is the union's primary means of communicating information concerning collective bargaining, contract administration, and employees' rights to employees represented by BRAC. Recent articles have reported the initiation and outcome of negotiations, explained contract demands, announced a strike ballot, and discussed issues involved in a potential strike. In addition, the magazine reports on significant events for individual System Boards—including the announcement of a pact with Western Airlines. The publication also has given advice concerning unemployment and health benefits, annuity rights, and insurance. While the magazine also includes general and recreational materials to make it more readable, that fact does not detract from the publication's value in the collective bargaining process. It would be extremely difficult for a union to represent employees without .an effective means of communication.

## D. Grand Lodge Social Activities

The union purchases refreshments for business meetings and occasional social activities, which are open to non-member agency fee payers as well as union members. Only miniscule amounts of money—approximately .70 of one percent of Grand Lodge expenditures—are involved. These small expenditures are important to the union's members because they bring about harmonious working relationships, promote closer ties among employees, and create a more pleasant environment for union meet-

ings. For these reasons, we believe that these costs are germane to the work of the union in the realm of collective bargaining.

## E. Grand Lodge Death Benefits

Death benefit plans have historically played an important role in labor organizations. Indeed, many unions originated as mutual benefit societies.

In addition, insurance benefits are a mandatory subject of collective bargaining. *Allied Chemical Workers v. Pittsburgh Plate Glass*, 404 U.S. 157, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971). If BRAC chooses to provide death benefits itself for all employees, rather than to seek such benefits from the employer, it is then in a better position to negotiate for additional benefits or higher wages.

Moreover, the negative consequences of permitting employees to withdraw from participation in the program are potentially quite great. If low-risk employees—the younger, healthier employees with longer life spans—could opt out, the financial stability of the program would be threatened by the number of claims coming from the remaining high-risk, older employees. Thus, provision of a death benefits plan, which tends to strengthen the employees' ties to the union, is germane to the work of the union within the realm of collective bargaining.

## F. Grand Lodge Organizing Efforts

Maximum organization of an industry benefits employees and units already organized. A union is considerably strengthened if it eliminates competition from non-union employers and a stronger union is unquestionably a more effective collective bargaining agent. Successful organizing efforts thus can strengthen the union's position at the collective bargaining table immeasurably.

## CONCLUSION

As the above discussion demonstrates, each of the challenged expenditures can be seen to promote, support or maintain the union as an effective collective bargaining

agent and therefore such expenditures are germane to the work of the union in the realm of collective bargaining. The district court is instructed to enter judgment in favor of BRAC and to conduct any further proceedings necessary to comply with this opinion.

AFFIRMED in part; REVERSED in part; REMANDED.

WHELAN, District Judge, dissenting:

I dissent. I would affirm the trial judge in every respect.

Where I differ from the majority is that I would affirm that part of the trial court's judgment which held that the appellants were not required to contribute to the expenditures made by the Grand Lodge of defendant Union, which are listed in paragraph 22 of the Court's findings of undisputed material facts and conclusions of law decided on the motion for summary judgment, as the same was amended in the order amending summary judgment, which amending order amended paragraph 22 of such undisputed material facts. Such amendment substituted a new subparagraph 10 in place of the old subparagraph 10. The new subparagraph 10 of paragraph 22 reads:

"(10) Defense or prosecution of litigation not having as its subject matter the negotiation or administration of collective bargaining agreements with Western Airlines, or settlement or adjustment of grievances or disputes of employees of Western Airlines."

The majority reverses the decision of the trial court with respect to paragraph 22 just mentioned.

The activities which are listed in paragraph 22 as amended are set forth verbatim:

"22. BRAC has engaged in the following activities since June 30, 1972:

(1) Recreational, social and entertainment expenses for activities not attended by management personnel of Western Airlines.

(2) Operation of a death benefit program.

(3) Organizing and recruiting new members for BRAC among Western Airlines bargaining unit employees.

(4) Organizing and recruiting new members for BRAC, and/or seeking collective bargaining authority or recognition for:

(a) employees not employed by Western Airlines;

(b) employees not employed in the air transportation industry;

(c) employees not employed in other transportation industries.

(5) Publications in which substantial coverage is devoted to general news, recreational and social activities, political and legislative matters, and cartoons.

(6) Contributions to charities and individuals.

(7) Programs to provide insurance, and medical and legal services to the BRAC membership, or portions thereof, other than such programs secured for its salaried officers and employees.

(8) Conducting and attending conventions of BRAC.

(9) Conducting and attending conventions of other organizations and/or labor unions.

(10) Defense or prosecution of litigation not having as its subject matter the negotiation or administration of collective bargaining agreements with Western Airlines, or settlement or adjustment of grievances or disputes of employees of Western Airlines.

(11) Support for or opposition to proposed, pending, or existing legislative measures.

(12) Support for or opposition to proposed, pending, or existing governmental executive orders, policies, or decisions."

The opinion of the majority seems to base its reasoning on what, to this member of the Court, is an erroneous conception of the

law. The majority opinion relies on the language of the District Court opinion in *Seay v. McDonnell Douglas Corporation, et al.*, 371 F.Supp. 754, 761 (C.D.Cal.1973). The *Seay* case was appealed to the Ninth Circuit, and the Ninth Circuit reversed the summary judgment granted to the Union. The trial judge in his memorandum of decision granting summary judgment cited an earlier decision in the same action wherein the trial judge in such earlier decision had ruled that the only union expenditures to which non-union employees did not have to contribute were for payments to or on behalf of any candidate for public office or to or on behalf of any political party or organization or for the holding of any meeting or printing or distribution of any literature in support of any such candidate or political party or organization. The trial judge in this latter case stated, as appears in the footnote in 371 F.Supp. 754, 762, that expenditures for other purposes, regardless of their political nature, would be expenditures to which non-union employees must contribute. This member of the Court considers that such a rule would be violative of a non-union member's right to be free from association and that, in fact, such a rule is violative of the First Amendment right of appellants.

This member of the Court considers that the majority misreads what has been said or held by the Supreme Court concerning union expenditures to which non-union employees must contribute. The Supreme Court has, of course, ruled that non-union employees are required to contribute to expenditures having to do with the negotiation, administration or enforcement of the collective bargaining agreement with Western Airlines, in this instance, as well as expenditures which are germane to collective bargaining. It is submitted that the meaning of "germane to collective bargaining" refers to the collective bargaining agreement, in this instance, the collective bargaining agreement with Western Airlines. Also, it would seem that "germane" should be considered as meaning closely related to the collective bargaining agreement with Western Airlines in this instance.

The majority would seem to have completely ignored the language of the Supreme Court in *Retail Clerks v. Schermerhorn*, 373 U.S. 746, 754, 83 S.Ct. 1461, 1465, 10 L.Ed.2d 678 (1963). Also, the majority would seem to ignore the suggestions implicit in such language—to wit, that a non-union dissident employee cannot be required to contribute to pay institutional expenses of the union. The Supreme Court states that such institutional expenses are those things which the members authorize the union to do in their interests and on their behalf. It would seem to this member of the Court that the activities identified in paragraph 22 are such institutional activities.

Furthermore, the Supreme Court in *Abood v. Detroit Board of Education*, 431 U.S. 209, at page 236, 97 S.Ct. 1782, at page 1800, 52 L.Ed.2d 261, states that expenditures of the union in ideological activities unrelated to collective bargaining are prohibited as expenditures to which the dissident non-union employee must contribute. It is submitted that the activities set forth in paragraph 22 are clearly activities to which dissident non-union employees need not contribute.