Carl MATHEWS, Plaintiff
and Appellee,

v.

TWIN CITY CONSTRUCTION COMPA-
NY, INC., A North Dakota Corporation,
and John Doe, Defendants,

and

Iron Workers Local Union No. 184, A
Union Labor Organization of Sioux
City, Iowa, Appellant.

Nos. 14415, 14416.

Supreme Court of South Dakota.

Argued May 22, 1984.

Decided Oct. 3, 1984.

**502**

Robert B. Anderson of May, Adam, Gerdes & Thompson, Pierre, for plaintiff and appellee.

Harry H. Smith, Sioux City, Iowa, Robert O'Connor, Sioux Falls, for defendants and appellant.

FOSHEIM, Chief Justice.

The jury awarded plaintiff (Mathews) $3,500 compensatory and $3,500 punitive damages. The trial court set aside the punitive damages and entered judgment against Iron Workers' Local Union No. 184 (Union) for $3,500.[1] Union appeals from a denial of motions n.o.v. and for a new trial. Mathews filed a notice of review as to punitive damages. We affirm in part and reverse in part.

This case was previously before us, 323 N.W.2d 901 (S.D.1982), to which we refer for further background. The trial court dismissed the action because the activity complained of was within the exclusive jurisdiction of the National Labor Relations Board (NLRB). *Id.* at 902. On appeal we held that because the complaint alleged a cause of action based on the existence of an agreement barred by provisions of our state "right-to-work" law, it was within the jurisdiction of our state courts to litigate and that Mathews should be permitted to prove his claimed grievance. *Id.* at 903. We accordingly reversed and remanded with directions to reinstate the complaint.

Mathews essentially alleged that after being called back to work, he was advised by an agent of Twin City Construction Company (Twin City) that his employment had to be terminated because of his non-union status. He claimed that his termination was the result of an agreement between the Union and Twin City which required union membership as a prerequisite to continued employment on the project, all contrary to the provisions of SDCL ch. 60–8. He further alleged the defendant's conduct exhibited oppression, malice, and an intent to vex or harm him, justifying punitive damages. The validity of a civil cause of action under these statutes was not disputed.

Union presents these issues:

I. Whether the doctrine of federal preemption rendered the Trial Court without subject matter jurisdiction over Mathews' claims for relief.

The Trial Court concluded it did not.

II. Whether in order to recover against the Union for a violation of SDCL § 60–8 Mathews was required to prove the existence of a written union shop agreement between the Union and Twin City.

The Trial court concluded he was not.

III. Whether the Union stood entitled to an instruction providing for a privilege defense to Mathews' claim insofar as it was based on an intentional interference with his employment contract.

The Trial Court concluded it was not.

---

1. Twin City and Mathews reached a settlement prior to trial. Twin City did not participate further and is not involved in this appeal.

Mathews seeks review of the order setting aside the punitive damage award.

## I. PREEMPTION

In 1935 Congress enacted the National Labor Relations Act (NLRA) (29 U.S.C.A. § 151 *et seq.*), commonly referred to as the Wagner Act. Section 7 of that Act guaranteed to employees the right to self-organize and, pursuant to that section, employers and unions had the freedom to select a form of union security on which they could agree and which was not prescribed by such act.

■ The Wagner Act was amended in 1947 by the National Labor Management Relations Act (29 U.S.C.A. § 141 *et seq.*), known as the Taft-Hartley Act. That act guaranteed employees the right to refrain from participating in any, or all, union activities. The "closed-shop" was outlawed. However, in order to afford unions protection from "freeloaders," certain union-security devices were authorized. Section 8(a)(3) of the Act permits employers to enter into security agreements with unions.[2] One variety of a union security agreement covered by § 14(b) is a "union shop" which requires that no one will remain employed who does not join the union within a short time after being hired. *Oil, Chemical and Atomic Workers, International Union, AFL–CIO, v. Mobil Oil Corp.*, 426 U.S. 407, 96 S.Ct. 2140, 48 L.Ed.2d 736 (1976) (hereinafter referred to as *Oil Workers*). Another type of union security agreement is an agency shop.[3]

■ A hiring hall which, though exclusive, does not require union membership does not violate the closed shop prohibition of § 8(a)(3), *Local 357, Int'l. Bhd. of Team-*

*sters, Chauffeurs, Warehousemen & Helpers of America v. NLRB*, 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed.2d 11 (1961), and thus is not within the ambit of § 14(b). *Cf. Retail Clerks Int'l Ass'n. v. Schermerhorn*, 373 U.S. 746, 751–752, 83 S.Ct. 1461, 1464–1465, 10 L.Ed.2d 678, 682–683 (1963). *Stricker v. Swift Bros. Construction*, 260 N.W.2d 500 (S.D.1977).

Section 14(b) of the Taft-Hartley Act, 29 U.S.C.A. § 164(b) provides:

> "(b) Nothing in this subchapter shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law."

Article VI, § 2 of our Constitution provides in part:

> The right of persons to work shall not be denied or abridged on account of membership or nonmembership in any labor union, or labor organization.

SDCL 60–8–3 restates this constitutional provision. SDCL 60–8–1 further makes it unlawful to prevent a hired workman from continuing or performing his job. By these enactments, South Dakota has clearly elected to exercise the 14(b) exemption of the Taft-Hartley Act.

■ The National Labor Relations Act established a policy of national uniformity in labor relations. Congress implemented this policy through the creation of centralized administration, i.e. the National Labor Relations Board. *Bebensee v. Ross Pierce Elec. Corp.*, 400 Mich. 233, 253 N.W.2d 633 (Mich.1977).

---

**2.** "Sec. 8. (1) It shall be unfair labor practice for an employer—

. . . . .

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: *Provided,* That nothing in this Act, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization ... to require as a condition of employment membership therein on or after the thirti-

eth day following the beginning of such employment or the effective date of such agreement, whichever is the later...."

**3.** The employee, though not required to join the contracting union, is required, as a condition of employment, to pay to the union initiation fees and regular dues. *Retail Clerks Int'l v. Schermerhorn*, 373 U.S. 746, 83 S.Ct. 1461, 106 L.Ed.2d 678 (1963). The record does not indicate an agency shop agreement existed here.

It has been the task of the United States Supreme Court to shape the federal preemption doctrine in this area whereby the rights allowed the States and Territories are protected and the Congressionally established policy of uniformity is achieved. Any discussion of this effort must start with the landmark case of *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). In *Garmon*, the court announced that the overriding test in determining preemption "focuse[s] on the nature of the activities which the States have sought to regulate, rather than on the method of regulation adopted. When the exercise of state power over a particular area of activity threaten[s] interference with the clearly indicated policy of industrial relations, it has been judicially necessary to preclude states from acting .... [we have not required] withdrawal from the states of power to regulate where the activity regulated was a merely peripheral concern of the Labor Management Relations Act ... or where the regulated conduct touched interests ... deeply rooted in local feelings and responsibility[.]" *Id.* at 243–244, 79 S.Ct. at 778–779. Several other significant cases followed. Specifically regarding the application of § 14(b), Justice Douglas accurately predicted in *Retail Clerks International Ass'n. Local 1625 v. Schermerhorn*, 375 U.S. 96, 84 S.Ct. 219, 11 L.Ed.2d 179 (1963):

> As a result of § 14(b), there will arise a wide variety of situations presenting problems of the accommodation of state and federal jurisdiction in the union-security field.

375 U.S. at 105, 84 S.Ct. at 223. Justice Douglas further wrote:

> [S]tate power, recognized by § 14(b), begins only with actual negotiation and execution of the type of agreement described by § 14(b). Absent such an agreement, conduct arguably an unfair labor

practice would be a matter for the National Labor Relations Board under Garmon.

375 U.S. at 105, 84 S.Ct. at 223.[1]

The Union relies heavily on *Local 926, Intern. Union of Oper. Egn. v. Jones*, 46 U.S. 669, 103 S.Ct. 1453, 75 L.Ed.2d 368 (1983). In *Jones*, however, the plaintiff first filed a complaint with the NLRB alleging violations of § 8(b)(1)(A) and (B) of the NLRA. *Id.* at 1456. When NLRB refused to file suit, Jones proceeded in state court exclusively on the common-law tort theory of intentional interference with his bargaining agent employment contract. *Id.* at 1457. The court recognized the issue in that case involved *only* preemption of the common-law tort, not the validity or preemption of the Georgia "right to work" law. *Id.* at 1458, fn. 7. The Court in *Jones* did not discuss the application of § 14(b) as it relates to a state's enforcement of "right to work" laws. It is thus distinguishable and can not be relied upon as controlling authority for the § 14(b) preemption issues herein.

*Brown v. Hotel Employees*, —— U.S. ——, 104 S.Ct. 3179, 82 L.Ed.2d 373 (1984), was decided after this case was argued. In *Brown*, the court held that the New Jersey Crime Control Act was not preempted by the NLRA. The Court discussed § 603 of the Labor-Management Reporting and Disclosure Act. *Id.* —— U.S. at ——-——, 104 S.Ct. at 3187–3189. Like § 14(b) at issue here, "§ 603(a) is an express disclaimer of pre-emption except where such preemption is expressly provided ..." Id. —— U.S. at ——, 104 S.Ct. at 3188. Again, like § 14(b), "[i]n affirmatively preserving the operation of state laws, § 603(a) indicates that Congress necessarily intended to preserve *some* room for state action ..." *Id.* —— U.S. at ——, 104 S.Ct. at 3189. The court discussed the presumption of federal preemption based on the primary jurisdic-

---

**4.** For that reason, we distinguish this case from *Stricker v. Swift*, 260 N.W.2d 500 (S.D.1977). In *Stricker*, the employer and the Union were in the process of negotiating an agreement. We also distinguish *Baumgartner's Electric Const. Co. v. DeVries*, 77 S.D. 273, 91 N.W.2d 663

(1958), *reversed* 359 U.S. 498, 79 S.Ct. 1117, 3 L.Ed.2d 976 (1959), *reh. den.*, 360 U.S. 923, 79 S.Ct. 1431, 3 L.Ed.2d 1538 (1959), for the same reason. No agreement had been finalized in those cases. There is no indication here that any agreements were incomplete.

tion of the NLRB and stated that this presumption:

"properly admits to exception when unusually 'deeply rooted' local interests are at stake. In such cases, appropriate consideration for the vitality of our federal system and for a rational allocation of functions belies any easy inference that Congress intended to deprive States of their ability to retain jurisdiction over such matters. We have therefore, refrained from finding that the NLRA preempts state court jurisdiction over state breach of contract actions by strike replacements, *Belknap Inc. v. Hale*, 463 U.S. 591, 103 S.Ct. 3172, 77 L.Ed.2d 798 (1983), state trespass actions, *Sears, Roebuck & Co. v. Carpenters*, 436 U.S. 180, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978), or state tort remedies for intentional infliction of emotional distress, *Farmers v. Carpenters*, 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977).[5]

In *Oil Workers*, 426 U.S. 407, 96 S.Ct. 2140, 48 L.Ed.2d 736 (1976) the Court explained the application of § 14(b): "While § 8(a)(3) articulates a national policy that certain union-security agreements are valid as a matter of federal law[,] § 14(b) reflects Congress' decision that any state or territory that wishes to may exempt itself from that policy." *Id.* at 417, 96 S.Ct. at 2145. *See also, Sherman v. St. Barnabas Hospital*, 535 F.Supp. 564 (S.D.N.Y.1982). The *Oil Workers* case held that under § 14(b) the enforceability of state "right to work" laws is determined in part by looking to the location of an employee's job situs. *Id.* 426 U.S. at 414, 96 S.Ct. at 2143. There is no question in this case that the job situs was not on a federal enclave; rather, it was entirely within the boundaries of the state of South Dakota.

■■■■ The § 14(b) exemption allows states to prohibit *post*-hiring conduct amounting to union or agency shops. *Id.* at 417, 96 S.Ct. at 2145. *See also, Stricker v. Swift*, 260 N.W.2d 500 (S.D.1977);

*Schermerhorn*, 375 U.S. at 105, 84 S.Ct. at 223; *International Union v. NLRB*, 675 F.2d 1257 (1982), *cert. denied*, 459 U.S. 1171, 103 S.Ct. 816, 74 L.Ed.2d 1014 (1983). It clearly appears that this case involves post-hiring conduct: At all times relevant, a written collective bargaining agreement was in force between the Union and Twin City. This agreement required Twin City to use the Union's hiring hall referral system in hiring workers, but without regard to membership in the Union.

It provides in part:

When a local union does not furnish qualified workmen within forty-eight (48) hours (Saturdays, Sundays and holidays excluded), the contractor shall be free to obtain workmen from any source.

Mr. Cahill, the Union representative, testified that the Union and Twin City conducted their labor negotiations for this project in the fall of 1979. He conceded that in these talks the Union did not require Twin City to hire its iron workers through the hiring hall. The evidence clearly indicates that pursuant to the collective bargaining agreement, and with the full knowledge and consent of the Union, Twin City bypassed the hiring hall procedure. Mathews was hired directly by Twin City because the hiring hall was unable, or for some reason chose not, to furnish the needed iron workers within the bargaining agreement time frame.

This evidence devastates the Union's argument that Mathews' termination was merely an enforcement of the written bargaining agreement. If he was admittedly hired in conformity with the bargaining agreement, he could hardly be fired on the grounds his employment was in derogation of that agreement. The Union, however, could not be expected to argue that Mathews was fired because his continued employment violated a separate union shop agreement.

---

**5.** We would note also that in *Farmers v. Carpenters,* the court's decision rested in part on the outrageous character of the defendant's con-

duct. In this case, by their verdict on punitive damages, the jury found the Union's conduct exhibited oppression, fraud or malice.

As we indicated in *Mathews I, supra,* the critical question is whether there was sufficient evidence for the trier of facts to find a union shop agreement existed under our state right to work law. Counsel for appellant conceded in argument that if a formal security agreement did exist, the courts of this state have jurisdiction to enforce our right to work laws in that regard under § 14(b). *See, Oil Workers,* 426 U.S. 407, 96 S.Ct. 2140, 48 L.Ed.2d 736; *Schermerhorn,* 375 U.S. 96, 84 S.Ct. 219, 11 L.Ed.2d 179. We turn then to the evidence in the record.

Mathews was not a union member when employed, nor did he ever join the union. He was paid below the union wage scale, but was given no indication that his non-union status would cause him to be fired. He worked a little over a month as an iron worker tying rebar steel, from November 19, 1979 until the first week of January, 1980. He was able to do both rebar and structural steel work, and was also willing to work outside in mid-winter. Inclement weather, however, closed the entire construction project in early January, and Twin City temporarily laid off Mathews and other employees.

It was Twin City's intention that Mathews return to work in the same capacity— i.e., as an iron worker—when weather conditions permitted. Mathews was so advised. In fact, during the lay off, Mr. Rich Doyle, superintendent of the construction project for Twin City, took him to North Dakota to observe a similar project so that they would be better prepared to resume work in Pierre.

When construction on the Pierre Mall resumed in late February, 1980, Mr. Doyle personally asked Mathews to return to work as an iron worker. Neither Mathews nor the other returning employees had to be "re-hired." No new employment forms or applications were processed. They were in all respects regarded as continuing employees. When construction resumed, they were about to start the more desirable structural steel work.

However, when Mathews returned to work, problems immediately arose. It is significant that two new union iron workers then also appeared on the job, both of whom exhibited hostility to Mathews. One of these new workers telephoned Mr. Cahill, who negotiated contracts, placed employees and handled Union grievances and disputes. Cahill promptly contacted Twin City. We refer to Mr. Cahill's testimony:

Q. And you would agree that Mr. Mathews was terminated, fired, laid off, whatever you want to call it, from his job as an iron worker because of the fact he was not union, and you complained to Twin City Construction that he had not been hired through the union, you know that to be true, don't you?

A. Possibly, yes.

Mr. Doyle then summarily fired Mathews, telling him that because the Union and Twin City had some kind of an agreement, and because Mathews was not a union member, he had to be terminated. Mathews was further advised that he could no longer work for Twin City on the project and that this directive came from Cahill.

When the weather moderated the Union was, ostensibly for the first time, prepared to refer qualified iron workers. Mr. Cahill then advised Doyle that at the risk of a picket Twin City must henceforth hire all iron workers on the project through the hiring hall and that Mathews and the other nonunion iron workers that had been otherwise hired could not be retained. It is also significant that during the first month of employment Mathews had no problem with the Union. Neither Twin City or the Union contend Mathews would have been fired if he had joined the Union during this grace period. After Mathews' termination, only union members were employed on the project. As a subsidiary of the preemption issue we now turn to appellant's contention that the union shop security agreement must be in writing to become the subject of state jurisdiction under § 14(b).

An employer and union desirous of effecting a union shop arrangement would

unlikely reduce it to writing in a "right-to-work" state. No United States Supreme Court decisions requiring a security agreement to be written have been cited by the parties. *See* 52 Cal.Law Review 95, 108–109 (1965). At least one jurisdiction has concluded it need not be reduced to writing. In *Moore v. Local No. 10, Plumbers & Steamfitters Union*, 211 Va. 520, 179 S.E.2d 15, 18 (1971), the Virginia court said:

> The intent of § 14(b) of the Taft-Hartley Act is to permit state regulation of union-security agreements which otherwise would be allowed under § 8(a)(3) of the Act. In our opinion state regulation of such agreements, whether oral or written, is not only consistent with the intent of the Act, but also consistent with the language of § 14(b). To hold that § 14(b) applies only to written contracts would permit unions to thwart the purpose of that section by insisting that union-security agreements be solemnized orally and not reduced to writing.

We cannot conceive of agreeing that a written contract which violates a state right-to-work law is a proper subject of state court jurisdiction but that an equally violative oral contract is not proper for such jurisdiction.

■ In South Dakota, contracts may be oral except those that are specially required by statute to be in writing. SDCL 53–8–1. A contract may also be implied. An implied contract is one, the existence and terms of which are manifested by conduct. "Conduct" can be both acts and words. By its very nature, an implicit agreement is not as detailed as a written agreement formally negotiated. SDCL 53–1–3.

■ The Union's adamant and successful insistence that Mathews be summarily fired when union labor became available manifested conduct corroborating the statement of Rich Doyle that an agreement existed between the Union and Twin City necessitating Mathew's termination because he was not a union member. Mr. Cahill acknowledged that the collective bargaining agreement prohibited that proce-

dure after the initial hiring. This evidence indicates the firing must have been pursuant to some other agreement.

■ The trier of fact could thus reasonably find from the evidence that aside from the written collective bargaining agreement, an unwritten but equally binding agreement also existed that was enforced by the union. This could be an agreement standing alone, or simply an accord that union shop agreements, valid in non-"right-to-work" states would, by reference, also be treated as controlling in this state. The jury could, and apparently did, find that this agreement required summary discharge of nonunion members, who did not join the union within a prescribed time and regardless of whether they were union referred, when the hiring hall was able to replace them with union workers. That is at least the functional equivalent of a union shop. For the reasons stated in *Moore*, 179 S.E.2d at 18, we conclude that either a written or an unwritten union security agreement violates South Dakota "right to work" laws.

■ Because § 14(b) expressly allows a state to enforce its "right to work" laws against union and agency shop agreements, this case does not emerge as more than a peripheral concern of the NLRB. Though it may be said a conflict exists between federal and state law, it is a conflict recognized and sanctioned by Congress. *Schermerhorn*, 375 U.S. at 103, 84 S.Ct. at 222. Union or agency shops are valid "only if they are valid under the laws of any State in which they are to be performed." *Oil Workers*, 426 U.S. at 418, 96 S.Ct. at 2145. Such agreements are not valid in South Dakota. SDCL 60–8–1, 60–8–3. Moreover, it should be clear that "right to work" statutes "touch interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional directive it could not be inferred that Congress intended to deprive the state of the power to act," *Garmon, supra*, 359 U.S. at 244, 79 S.Ct. at 779, because the clear congressional directive in § 14(b) is that states *retain* the power to

act. *See also, Brown Hotel Employees* —— U.S. —— at —— – ——, 104 S.Ct. 3179, 3188–3189, 82 L.Ed.2d 373 (1984). Otherwise, § 14(b)'s exemption becomes a token, granted indeed by Congress, but seldom if ever, recognized in practice. Based on a combination of factors; Mathews' cause of action arose in this state, seeks relief available only in state courts,[6] and rests entirely on an alleged violation of our "right to work" statutes; it seems reasonable that it can be litigated in our state courts.

## II. DID THE TRIAL COURT ERR IN REFUSING THE UNION'S REQUESTED INSTRUCTION?

■ Appellant claims that the trial court should have given this instruction which it requested:

You are further instructed that under the laws of the United States the Union and Twin City Construction Company could lawfully enter into collective bargaining agreements which contained a clause commonly known as non-discriminatory hiring hall provisions. You are further instructed as a matter of law that the Union and Twin City Construction Company had, in fact, entered into

such agreement. Under the law the Union was privileged and entitled to talk to Twin City Construction Company and to require the company to comply with the terms of the collective bargaining agreement. If you find that the Union was acting to enforce the provisions of the collective bargaining agreement and was not acting pursuant to any other agreement between it and the Twin City Construction Company you must find for Defendant.

We find the Instructions as a whole and particularly Instructions No. 11 and 18[7] adequately covered the pertinent law. From the instructions counsel could, and did, fully argue the issue.

## III. PUNITIVE DAMAGES AWARD

■ The jury returned a verdict for Mathews assessing punitive damages against Union in the sum of $3,500. On September 19, 1983, after the jury verdict came in, the trial court entered an order on Union's motion for directed verdict made at the close of Mathews' evidence. Mathews filed a notice of review concerning the order of the trial court which set aside that

**6.** The NLRB has no general compensation scheme. *International Union, United Automobile Aircraft & Agricultural Implement Workers of America v. Russell,* 356 U.S. 634, 78 S.Ct. 932, 2 L.Ed.2d 1030 (1958) *reh. den.,* 357 U.S. 944, 78 S.Ct. 1379, 2 L.Ed.2d 1558 (1958).

**7.** Instruction No. 11 stated:

In determining whether or not the defendant Union's conduct in intentionally interfering with the employment contract between Twin City Construction Company and plaintiff Carl Mathews was improper or not, you may consider the following factors:

(a) The nature of the defendant Union's conduct;

(b) The motive of the defendant Union;

(c) The interests of Twin City Construction Company with which the defendant Union interferred;

(d) The interest sought to be advanced by the defendant Union;

(e) The social interests in protecting the freedom of action of the defendant Union and the contractual interests of Twin City Construction Company and plaintiff Carl Mathews;

(f) The proximity or remoteness of defendant Union's conduct to the interference; and

(g) The relations between the parties.

Instruction No. 18 stated:

In this state the "right-to-work" law makes it unlawful for the Defendants to enter into and to execute any agreement which required Plaintiff to join the Defendant Union, or to maintain membership in the Union in order to be hired to work for or to continue working for Defendant, Twin City Construction Company, within the state of South Dakota. Such an Agreement is generally known as a "union security agreement".

The provisions of the "right-to-work" law, however, do not make it unlawful for the Defendant, Twin City Construction Company, and the Defendant, Union, to enter into and execute a collective bargaining agreement, which required Defendant, Twin City Construction Company, to hire workers on projects in the state of South Dakota only from among persons referred to it by the Defendant, Union. Such an agreement is generally known as a "referral system". In this action, the Defendants had entered into and had executed a collective bargaining agreement, which contained a "referral system" which was lawful under the "right-to-work" law.

part of the verdict. The order granted a directed verdict on punitive damages. The Union requested a directed verdict, however, on the grounds that the matter was preempted. The Union argued only that there was insufficient evidence to show a written or oral contract existed which would take the matter out of NLRB primary jurisdiction. No arguments were made disputing punitive damages or the claimed oppressive, fraudulent or malicious conduct of the Union. The trial court committed a procedural error under South Dakota law in setting aside the award. *See, State v. Scott*, 84 S.D. 511, 173 N.W.2d 287 (1969) *cert. den.* 400 U.S. 821, 91 S.Ct. 39, 27 L.Ed.2d 49 (1970); *See also, Raebel v. Fishers Grove Golf Course, Inc.*, 88 S.D. 20, 214 N.W.2d 785 (1974).

■ While we believe that is enough to reverse the trial court and reinstate the award, we will address this further because of the importance of the issue. As we have stated, the action before us is strictly a state law matter governed by our "right to work" statute and not preempted because of the application of § 14(b). In *Local 20, Teamsters, Chauffeurs & Helpers Union v. Morton*, 377 U.S. 252, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964), the Supreme Court held that because the substantive law of a state had been preempted, it followed that a punitive damage award could not stand. *Id.* at 260–261, 84 S.Ct. at 1258–1259. The converse rationale is applicable here. Since the substantive state law in this case is not preempted, the punitive damages award is valid.

In South Dakota, punitive damages may be awarded for "any action for breach of an obligation not based on contract," SDCL 21–3–2, and when circumstances demonstrate a defendant is guilty of oppression, fraud or malice. SDCL 21–3–2; *See also, Hannahs v. Noah*, 83 S.D. 296, 158 N.W.2d 678 (1968), reaffirmed in *Till v. Bennett*, 281 N.W.2d 276 (S.D.1979). Thus, our punitive damages statute contemplates tortious conduct carried out in a particularly abusive manner. While *Farmer v. United Bhd. of Carpenters & Joiners of America,*

*Local 25*, 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 388 (1977), involved a common-law tort action rather than a statutory § 14(b) "right to work" law issue, the Court delineated similar considerations in upholding California's jurisdiction. *Id.* at 305, 97 S.Ct. at 1066. Punitive damages were awarded by the state jury in *Farmers. Id.* at 294, 97 S.Ct. at 1060. The Court in *Farmer* held:

> "On balance, we cannot conclude that congress intended to oust state-court jurisdiction over actions for tortious activity such as that alleged in this case [intentional infliction of emotional distress]. At the same time we reiterate that concurrent state court jurisdiction cannot be permitted where there is a realistic threat of interference with the federal regulatory scheme ... simply stated, it is essential that the state tort be either unrelated to employment discrimination or a *function of the particularly abusive manner in which the discrimination is accomplished or threatened* rather than a function of the actual or threatened discrimination itself." (emphasis added). *Id.* at 305, 97 S.Ct. at 1066.

It follows then, and we hold the matter is not preempted and the punitive damage award must stand; 1), because South Dakota's jurisdiction over this matter is only a peripheral concern of the NLRB and does not interfere with the federal regulatory scheme—any conflict that does exist is one sanctioned by Congress, *Schermerhorn*, 375 U.S. at 105, 84 S.Ct. at 223, 2), because enforcing South Dakota's "right to work" law is a matter deeply rooted in local concern, the inference clearly being that Congress intended that states retain the power to act, *Garmon, supra* 359 U.S. at 244, 79 S.Ct. at 779, *Brown, supra* —— U.S. at —— ——, 104 S.Ct. at 2188–2189, and 3), because the punitive damages award is merely a function of the "particularly abusive manner" *Farmer*, 430 U.S. at 305, 97 S.Ct. at 1066, in which the violation of our law occurred.

We affirm the judgment on the issue of preemption, but reverse on the punitive damages award and order that the award be reinstated.

WOLLMAN, MORGAN and HENDERSON, JJ., concur.

DUNN, Retired Justice, dissents.

WUEST, Circuit Judge, acting as Supreme Court Justice, not participating.

DUNN, Retired Justice (dissenting).

The decision of the trial court should be reversed because the court lacked jurisdiction, as Mathews' claims were preempted by federal law.

If Mathews claimed, and the jury found, that the Union interfered with his employment contract with Twin City, in violation of "right to work laws," it is preempted because Sections 8(b)(1)(A) and 8(b)(2) of the NLRA, as amended, expressly prohibit such conduct and it would be an unfair labor practice.

If the claim is made that Mathews' employment contract was in violation of SDCL ch. 60–8, the only evidence of contracts presented was the Union and Local agreements, which only contained nondiscriminatory referral system provisions and were not prohibited Union security agreements. Lacking evidence of a Union security agreement, there is no jurisdiction provided for state courts under SDCL ch. 60–8.

The majority would read in an oral Union security agreement "because that was the only way he could have been fired" under the written agreements. It overlooks the fact that his firing could arguably be an unfair labor practice under the federal act.